650 So.2d 1289 (1994)
Jimmie MACK
v.
STATE of Mississippi.
No. 91-DP-0764.
Supreme Court of Mississippi.
December 21, 1994.
Rehearing Denied March 23, 1995.
*1294 Raymond L. Wong, Cleveland, James W. Craig, Andre de Gruy, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Marvin L. White, Jr., Asst. Atty. Gen., Charlene R. Pierce, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BANKS, Justice, for the Court:

I.
On November 19, 1990, Jimmie Mack, Robert Washington, and Percy Monroe were indicted by the Circuit Court of Bolivar County, Mississippi, for the crime of capital murder, arising out of the death of Henry Fulton, who was killed by repeated blows to the head during a robbery at his home on June 20, 1990. Washington pled guilty to grand larceny and accessory after the fact to the capital murder. Monroe was tried on a lesser charge and acquitted. Mack pled not guilty to the charges. On June 24, 1991, Mack's trial commenced. At the conclusion of the trial on Saturday, June 29, 1991, the jury returned a guilty verdict. After the sentencing hearing, the jury returned a verdict of death by lethal injection. Mack's motion for J.N.O.V. or, in the alternative, for a new trial was denied on July 26, 1991. Mack perfected this appeal from the judgment and sentence in a timely manner.

II.
During the early morning hours of June 20, 1990, Washington and Mack left Bolton and drove to Gunnison, to Mack's friend Monroe's mother's home. Eventually, Mack, while en route to Cleveland so that Monroe could see his newborn child, drove with the others to Mound Bayou in search of cocaine. Mack drove to a club downtown where he met Greg Hooper. Hooper agreed to help Mack find some "crack" cocaine. Mack drove Hooper, with Monroe and Washington, to a fishing site and purchased the crack from a person there. While returning to the club, Mack smoked the crack. Thereafter, Mack took Hooper back to the club and told him he would return with more money to purchase more crack.
From there, Mack drove to his aunt's, Mrs. Dawkins', house to get some money. Mrs. Dawkins told Mack that she did not have any money. Mack then asked Darrell Dawkins if Mr. Fulton, a neighbor of the Dawkins, was home. Dawkins answered affirmatively, and *1295 Mack then drove down the road to Fulton's house, telling Monroe and Washington that he was going to sell Fulton a jack.
Mack pulled into Fulton's yard and blew his horn. Fulton came out of his house and Mack got out of the truck to talk to him. The jack that Mack was going to sell Fulton was in the bed of the truck, along with other items, including an iron pipe. Monroe testified that he remained in the truck and when he looked back to see what was going on, he saw Mack draw an iron pipe back and hit Fulton in the head. Although Washington claimed that he stayed in the truck, Mack testified that Washington was standing outside the truck with him when he "slapped" Fulton. At any rate, Fulton fell to the ground from an injury that he sustained. Mack then took Fulton's wallet from Fulton's pocket. Mack laid the iron pipe down and ran into Fulton's house where he was joined by Washington.
Testimony at trial concerning items taken from Fulton's home varied. Washington testified that he did not get out of the truck and take anything out of Fulton's home. However, Monroe testified that both Washington and Mack took several items out of Fulton's home, including a pistol, rifle, television, and a small radio. Monroe's testimony was corroborated by Mack.
After putting the loot in the bed of the truck, Mack picked up the iron pipe again. Monroe got out of the truck and grabbed Mack's arm to keep him from hitting Fulton again. Fulton was clearly alive at this time. Mack drew the iron pipe back to hit Monroe. This forced Monroe to step out of Mack's way. Saying "I'm not leaving any witnesses," Mack hit Fulton several more times until his skull burst open. After Mack finished beating Fulton, Monroe reached down and took Fulton's pulse. Monroe told Mack that Fulton was dead. Fulton's body was placed on the truck and dumped in a bushy area along the side of the road.
After disposing of Fulton's body, the three returned to Dawkins' home. Only Mack got out of the truck. Seeing that Darrell Dawkins and Kerry Reynolds had just returned from drawing water from the well, Mack asked for a glass of water. However, instead of drinking the water, Mack poured it on the back of the truck in an attempt to wash away Fulton's blood.
Dawkins and Reynolds saw the blood on the truck. At that point, Mack, who was carrying the pistol taken from Fulton's home, told Reynolds "If you say anything, I'll blow your brains out." Reynolds told Mack that he was not going to say anything. Darrell testified that he heard Mack threaten Reynolds. Mack also told the other people at the Dawkins' home not to go down the road. When he was asked if he had seen snakes down there, he told them, that there was something worse than snakes.
Shortly thereafter, Mack returned to the truck and the trio headed to Mound Bayou in search of Hooper. After picking Hooper up, Mack went back to the fishing hole to find the person who had sold him crack cocaine earlier that day. He wasn't there, so Mack drove to a house in the country. Mack gave Hooper money to go in and purchase more crack. After purchasing the cocaine, Mack took Hooper back to the club and dropped him off. He did not smoke the crack. It was found on Monroe's person when the trio was arrested.
Meanwhile, the Dawkins became suspicious. Albert Dawkins saw Mack's truck earlier that evening at Fulton's home. When returning to her mother's after work, Jacqueline Dawkins saw someone carrying a television out of Fulton's house. Despite Mack's warning earlier that day, Albert walked down the road first and then went back to get Jacqueline after he saw some blood along the road. The two returned home and told their mother that something was wrong. Since Mrs. Dawkins did not have a telephone, she went next door to her neighbor's to phone the authorities. After making the call, her neighbors took her to town to talk with the authorities.
Somewhere within that same time period, Mack was dropping Hooper off at the club. *1296 While Mack was in the club, someone told him that the police were looking for him. Mack, followed by Washington ran out of the club, jumped in the truck, and sped off. Mack told Monroe, who was still in the truck, that the authorities were looking for him. Monroe asked Mack to let him out of the truck. Mack told Monroe "No, we are in this together now."
For some reason, Mack drove past Fulton's house. It was along that road that Mack was first confronted by the authorities. A sheriff's car, which passed Mack travelling in the opposite direction, turned around and pursued Mack. Mack, ignoring entreaties by Monroe and Washington to let them out, tried to outrun the car. In an attempt to stop Mack, authorities shot at the truck tires. He ran off the road several times while the authorities were chasing him. However, despite the fact that several tires on the truck had been shot out, he managed to get back on the road. In the end, a law enforcement officer rammed his car into Mack's truck which caused Mack's truck to run into a ditch.
As he exited the truck, Mack shot at the law enforcement authorities. They fired back, wounding Mack. Mack, Monroe, and Washington were arrested and transported to the Bolivar County Jail where they were charged with the capital murder of Henry Fulton. Shortly after their arrival at the jail, Monroe gave authorities a statement. Mack refused to waive his Miranda rights but gave a statement denying involvement in the murder.
At the time of his arrest, Mack was under indictment on a burglary charge, and was being represented by Raymond Wong, the public defender. The court appointed Wong to represent him on the capital murder charge.

III
Mack brings this appeal, raising several issues, each of which will be addressed in this opinion.

A.

WHETHER THE STATE USED ITS PEREMPTORY CHALLENGES IN AN UNCONSTITUTIONAL MANNER TO STRIKE BLACKS FROM THE JURY?
Mack contends that the State used its peremptory challenges in an unconstitutional manner to exclude potential black jurors from the jury. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State used only four (4) of its twelve (12) challenges, all against blacks. Mack used seven (7) of his challenges against whites, three (3) challenges against blacks, and one (1) challenge against a Latina of Mexican descent. The defendant declined to give reasons and, out of an abundance of caution, the court did not order that he give reasons. The jury which was seated to try Mack's case included nine (9) blacks and three (3) whites. Four alternates were chosen, three of whom were black. The state used none of the four challenges accorded it against alternates. The defendant struck two whites and one black.
Under Batson, a defendant must show that (1) he is a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges to excuse a venire person of the defendant's race; and (3) that there is an inference that the venire persons were excluded on account of their race. Batson, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722-23. The burden then shifts to the State to come forward with a race-neutral explanation for challenging the jurors. Id.
Here, Mack raised the Batson issue prior to the State's use of its peremptory challenges. The trial court observed that the motion was premature and judicially noted that the county where the trial was held was 36.4% white and 62.9% black. Without ruling on whether a prima facie case was presented, the court required the State to state the reasons for its strikes, and the following reasons were given: (1) Marcus Mitchell  *1297 excluded because he was unemployed[1]; (2) Lillie Terrell  excluded because she was asleep during the court's voir dire, was extremely bored, was looking around, was yawning, put her head down, started fiddling around in her lap, she was wearing short pants, and because the prosecutor had information that she is related to Hope Terrell, one of the witnesses; (3) Joann White  excluded for writing a series of bad checks; and (4) Delora Banks  excluded because she stated that she had conscientious scruples against the death penalty. Mack offered no rebuttal argument but did contest, through cross examination the evidence concerning White's alleged bad checks. The court found that the reasons were race-neutral.
Mack now contends that the reasons offered by the State were pretextual. It is incumbent upon a defendant claiming that proffered reasons are pretextual to raise the argument before the trial court. Whitsey v. State, 796 S.W.2d 707 (Tex. Crim. App. 1989.) The failure to do so constitutes waiver.
Even if Mack had not waived the issue, we would find that the trial court did not err. We examine each challenge by the state.

(1)  Marcus Mitchell:
Mack argues that the State's reason for excluding Mitchell was pretextual because Susan Palacious, a white female,[2] who was also unemployed, was accepted by the State. Mack argues further that this pretextual reason had a disparate impact on black males from the Delta and indicates that the State had a lack of appreciation for the bleak economic conditions faced by men in Mitchell's circumstances. Mack concedes that perhaps if he were claiming an inability to find work as a defense for his actions or as a mitigating factor, Mitchell's employment status would be related to this particular case. However, he asserts that since this case does not raise the issue of unemployment, the fact that Mack is unemployed is unrelated to the case and is, therefore, pretextual under Batson. Mack asks this Court to follow Davis v. State, 551 So.2d 165, 170 (Miss. 1989), which states that the prosecutor must give reasons related to the case; and Whitsey v. State, 796 S.W.2d 707, 713 (Tex. Crim. App. 1989), where the court stated that pretext is shown where the reasons are not related to the facts of the case. In Batson, the Court stated that, "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried." 476 U.S. at 98, 106 S.Ct. at 1724.
Mack also asserts that the prosecutor's reason fails to rebut the claim of discrimination because it was not explored on voir dire. Mack cites Floyd v. State, 539 So.2d 357, 363-64 (Ala. Crim. App. 1987), where that court stated that the striking of black jurors because of their youth was not permissible where the prosecution failed to delve into age-related biases. Mack also cites St. Louis v. State, 584 So.2d 180, 182 (Fla.App. 1991), where the court found that the reason for the strike was pretextual when the prosecutor stated the juror was "not educated" enough but failed to determine educational background on voir dire, as well as, failed to show that a particular level of education was needed.
*1298 Mack, therefore, asserts three factors which have been identified as indicia of pretext: (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; and, (3) the characteristic cited is unrelated to the facts of the case. Whitsey, 796 S.W.2d at 707. (Other indices of pretextual strikes are lack of record support for the stated reason and group-based traits.)
This Court addressed the race neutrality of a challenge based on a juror's employment status with respect to disparity in Porter v. State, 616 So.2d 899 (Miss. 1993). In Porter, after the State struck two prospective black jurors because they were of an age to be employed and had no occupation, the defense argued that the prosecution accepted three white jurors who were also unemployed, two were homemakers and the third was retired. Porter, 616 So.2d at 907. We reasoned that "there exists a difference other than race between the two Black unemployed veniremen of employable age and the three Whites... . [h]omemaking is an honorable if somewhat tedious profession," and being unemployed is a race-neutral explanation that can be used to strike a juror. Id. See also Lockett v. State, 517 So.2d 1346 (Miss. 1987) (Appendix I at 1356-57) (unemployed with no roots in community is a race-neutral explanation). Mack's claim of pretext based on disparate treatment must fail.
The failure to voir dire usually comes in to play when the prosecutor expresses some suspicion or uncertainty about the true situation involving the juror, such as when he "believes" that the juror is related to a criminal, or has been involved in some activities which might engender a negative attitude toward the defendant. This factor is closely related to the lack of an evidentiary basis. Here, the fact that Mitchell was unemployed was reflected in the jury questionnaire. The prosecutor was not acting on a mere suspicion. Still, voir dire on this issue may have revealed an explanation for this status which would not have been consistent with assumptions regarding the stability and community values of the unemployed. The failure to conduct voir dire must weigh against the state in an evaluation of the bona fides of the proffered reason.
In the Batson formulation, the relationship of the reason to the facts of the case is to be considered. The usual role given this circumstance is as another factor tending to show that the proffered reason is pretextual. See Whitsey 796 S.W.2d at 714-15; State v. Slappy, 522 So.2d 18, 23-24 (Fla. 1988). This too, must weigh against the state. Nothing about the facts of this case suggests that a juror's employment status should be an issue.
These two factors which weigh against the state must be viewed, however, in light of the relative strength of the prima facie case of discrimination. The stronger the prima facie case, the more cogent the explanations from the state and supporting evidence must be and vice versa. See Ex parte Bird & Warner, 594 So.2d 676 (Ala. 1991). Here the victim as well as the defendant was black. The jury seated was 75% black. The venire selected for the jury was 56% black, which was the approximate percentage of the total venire. The state used only one third of its challenges. It used none of its challenges against alternates, the first three of whom were black. Of its total challenges then, the state used only 20%. This is a weak prima facie case.
Because the state gave reasons, the issue of whether there was a prima facie case is moot. Hernandez v. New York, 500 U.S. 352, 352-54, 111 S.Ct. 1859, 1862-63, 114 L.Ed.2d 395, 396 (1991). That is, the reasons given must be race neutral. Where the reasons are facially race neutral, however, a weak or non-existent prima facie case weighs against a finding of pretext. Here the fact that the prima facie case was weak, at best, compels the conclusion that we should not disturb the decision of the trial court that no discrimination was shown in the exclusion of juror Mitchell.

(2) Lillie Terrell:
The prosecutor challenged Terrell because she was asleep during the court's voir *1299 dire, was extremely bored, was looking around, was yawning, put her head down, started fiddling around in her lap, was wearing short pants, and was thirty-nine-years old and unemployed. The prosecutor had information that she was related to Hope Terrell, one of the witnesses. Mack contends that these reasons are indicative of the "shotgun" approach and signal a racially-motivated challenge.
Inattentiveness, boredom, dress, demeanor, unemployment, and sleeping during voir dire have all been determined by this Court to be racially neutral reasons. See e.g. Abram v. State, 606 So.2d 1015 (Miss. 1992) (inattentiveness is race neutral reason); Griffin v. State, 607 So.2d 1197, 1203 (Miss. 1992) (sleeping during voir dire race-neutral reason); Bradley v. State, 562 So.2d 1276 (Miss. 1990) (juror excused for wearing overalls and black t-shirt); Lockett v. State, 517 So.2d 1346 (Miss. 1987) (juror excused for wearing hat in courtroom).
One of the reasons for the challenge enunciated by the State, the age of Terrell, is "highly suspect because of its inherent susceptibility to abuse" Ex Parte Bird, 594 So.2d 676, 683 (Ala. 1991); however, this Court has held that "age" is an acceptable race-neutral reason. See Lockett v. State, 517 So.2d 1346 (Miss. 1987) (Appendix I at 1356-57); Simon v. State, 633 So.2d 407 (Miss. 1993) (But see Banks, dissenting.)
The trial court correctly rejected the challenge to Terrell based upon a suspected relationship, observing that the prosecutor could have raised the issue on voir dire. Nevertheless, Mack did not contest the observations made by the prosecutor concerning the demeanor and dress of the juror and the challenge was upheld. While the shotgun approach may be an indicator of pretext, the relative strength of the prima facie case again comes into play. The trial court ruled correctly in this instance.

(3) Joann Wilson:
The third challenge exercised by the State was to excuse Joann Wilson for writing a series of bad checks. Mack contends that a history of writing bad checks is not a race-neutral reason sufficient to overcome Batson. Mack also contends that there was a Rule 4.06 violation, because the State did not furnish him with the information relating to Wilson's history of writing bad checks prior to the jury selection. Unif.Crim.Rules Cir. Ct. 4.06. Mack asserts that he was denied access to the information that the district attorney had on potential jurors and claims that since the State only placed into the record information on African-American venire persons, he could not determine if the State accepted similarly situated white veniremen.
Mack's argument that the prosecutor violated Rule 4.06 by failing to give him information on the jurors is a novel one. This Court has not extended Rule 4.06 to information concerning prospective jurors and declines to do so here. That is not to say, however, that the prosecutor may, with impunity, withhold information concerning a prospective juror which impacts upon the juror's ability to be fair and impartial. See, Marshall Durbin, Inc. v. Tew, 381 So.2d 152, 155 (Miss. 1980) (Judgment reversed where plaintiff's counsel failed to disclose that he represented one of jurors in violation of his duty as officer of the court.); United States v. Kyle, 469 F.2d 547, 550 (D.C. Cir.1972) (Basic fairness may generate a duty to disclose where facts affecting jurors are of a nature likely to escape the attention even of reasonably diligent appointed counsel.); Couser v. State, 282 Md. 125, 383 A.2d 389, 398 (1978) (Prosecutor is under a duty to disclose facts within his knowledge indicating that a prospective juror has a fixed prejudice or bias against the defendant.); People v. Drake, 841 P.2d 364, 367 (Colo. App. 1992) (Prosecutor has duty to disclose that one of prosecution witnesses revealed he or she knew one of jurors.) There is no claim here of a failure to disclose information impacting upon a juror's ability to be fair and impartial.
Mack's argument that writing bad checks is not race-neutral must also fail. *1300 This Court has held that criminal activity, even for a minor crime, is an appropriate race-neutral reason. Conerly v. State, 544 So.2d 1370 (Miss. 1989). In Conerly, the Court upheld the striking of a prospective juror, who had been convicted of possession of open beer, and another, who had been arrested for public drunkenness seven years earlier. Id.; see also Griffin v. State, 607 So.2d 1197, 1202 (Miss. 1992) (the striking of a potential juror on the basis that the juror had been convicted and sentenced to jail for DUI and had other problems with the police upheld as race-neutral); Lockett v. State, 517 So.2d 1346, 1356 (Miss. 1987) (Appendix I) (criminal record is a race-neutral reason). In addition, the "prosecutor is not required to question prospective jurors about the race-neutral reasons later given, as long as the source of the information and the practice itself are not racially discriminatory." Johnson v. State, 529 So.2d 577, 584 (Miss. 1988).
This contention has no merit. The reason offered by the State to excuse Wilson was race-neutral.

(4) Delora Banks:
The prosecutor exercised a challenge to remove Banks because she stated that she had conscientious scruples against the death penalty. The court accepted the challenge stating, "This is the one that told the Court that she would automatically vote against the death penalty and then vacillated somewhat, back and forth, and we brought her into chambers for further voir dire."
Mack's argument that conscientious scruples against the death penalty is not a race-neutral reason for striking a prospective juror when a challenge for cause has been denied against that juror must fail. Opposition to the death penalty is not in the same suspect classification as race and is therefore, a race neutral reason. Turner v. State, 573 So.2d 657, (Miss. 1990) citing Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); Johnson v. State, 529 So.2d 577, 584 (Miss. 1988) ("Scruples against the death penalty are clearly race neutral").
Mack's contention that the trial court was not acting in a neutral capacity because, while refusing to excuse Banks for cause, it observed that she was susceptible to peremptory challenge for that reason, is also without merit. This isolated comment, which merely stated the obvious, is not so significant as to remove the presumption of impartiality. Turner v. State, 573 So.2d 657, 678 (Miss. 1990); Williams v. State, 383 So.2d 547 (Miss. 1979).

B.

WHETHER THE TRIAL COURT ERRED WHEN IT EXCUSED A JUROR FOR CAUSE WHO FAILED TO RESPOND TO A DIRECT QUESTION DURING VOIR DIRE?
The juror at issue here was number 75 on the venire. The last alternate juror was number 53. Excusing this juror, then, had no effect on the outcome of the case.
A juror is "disqualified" within Miss. Code Ann § 13-5-67 (Supp. 1994), where on voir dire examination he or she has withheld information or misrepresented material facts. McNeal v. State, 617 So.2d 999, 1003 (Miss. 1993) (withholding or misrepresenting information when a "clearly worded" question was posed during voir dire clearly violates Miss. Code Ann. § 13-5-67); see Lewis v. State, 580 So.2d 1279, 1283 (Miss. 1991) ("[t]he failure of a juror to respond to a relevant, direct, and unambiguous question leaves the examining attorney uninformed and unable to ask any follow-up questions to elicit the necessary facts to intelligently reach a decision to exercise a peremptory challenge or to challenge a juror for cause"); Myers v. State, 565 So.2d 554, 558 (Miss. 1990) (the nature of the Odom rule imports an objective test: "in the face of a clearly worded question propounded on voir dire examination, one that bears relevance to the case at bar, has the juror withheld substantial information or misrepresented material facts?"); Myers v. State, 565 So.2d 554, 557 (Miss. 1990); Odom v. State, 355 So.2d 1381 (Miss. 1978).
*1301 Here the juror failed to respond to the question whether she had an interest in any case pending before the circuit court. It developed that her husband had been tried and acquitted during the same term and another indictment was still pending. On further voir dire, in chambers, the juror responded that she did not know the status of the second charge. She acknowledged that she would have an interest, if the case went to trial, but claimed that the lawyer had expressed doubt about its coming to trial. A fair reading of the record would support the conclusion that the juror was confused as to whether she had an interest in a a case then "pending." The trial court found, however, that there was a case pending in which she had a personal interest and that she failed to respond. The challenge for cause was granted.
Failure to respond aside, the juror's husband had recently been prosecuted to trial by the same prosecutor and had another unindicted charge pending. The trial court can hardly be faulted for granting a challenge for cause. This assignment of error is without merit.

C.

WHETHER THE REMOVAL OF JURORS FOR CAUSE DENIED JIMMIE MACK AN IMPARTIAL JURY IN VIOLATION OF WITHERSPOON AND FUSELIER AND IN VIOLATION OF THE MISSISSIPPI CONSTITUTION, THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION:
Mack's brief addresses this assignment of error in three parts. With regard to the first two parts, Mack urges specific instances of error made during the State's and court's voir dire. A review of the record, however, shows that Mack did not object to either the comments made by the State or by the court. "Since [Mack] failed to object to the judge's remarks during voir dire, this aspect of [Mack's] assignment of error is procedurally barred." Corley v. State, 536 So.2d 1314, 1316 (Miss. 1988) citing Myers v. State, 268 So.2d 353, 356 (Miss. 1972). "The rule is well established that contemporaneous objection is necessary to preserve the right to raise an error on appeal." King v. State, 615 So.2d 1202, 1207 (Miss. 1993); Miss. R.Evid. 103(a). In part three, Mack argues that the court erred when it did not let him rehabilitate those jurors who the court felt should be excluded under Witherspoon. Although errors claimed in the first two parts have not been properly preserved for review, an analysis on the merit of all claims follows.

1. DID THE COURT CONDUCT INADEQUATE VOIR DIRE?
Mack contends that the trial court conducted voir dire on the death qualification issue, but did not adequately question the jurors to reach the truth of whether they could be impartial and consider all sentencing options. Mack argues that all but one of the prospective jurors stated during the early questioning by the court that they could follow the law and the instructions of the court, even if they did not agree with them. Mack argues that since these jurors answered that they could follow the law at the beginning of the court's voir dire, they should not have been excluded even though they answered that they would automatically vote against the death penalty in the later voir dire. Mack asserts that, at most, the eight prospective jurors gave contradictory statements which would indicate ambivalence, equivocation and/or confusion, any of which would require further inquiry on voir dire to clarify the jurors' views. Even though Mack acknowledges that these jurors were not removed until after both the state and the defense questioned the jury panel, he argues that venire members should only be excluded, if they are "irrevocably committed" to vote against the death sentence regardless of the facts and circumstances that might emerge in the course of the proceedings, and if their views would prevent them from making an impartial decision on the question of guilt. Witherspoon v. State, 391 U.S. 510, 422, n. 21, 88 S.Ct. 1770, 1777, n. 21, 20 L.Ed.2d 776, 785 (1968).
*1302 The trial court informed the jurors that the case was a capital case and that the death penalty could be imposed if there is a guilty verdict. The court then voir dired the panel to determine if any member of the panel had conscientious scruples against the infliction of the death penalty, when the law authorizes it, and where the testimony warrants it. The eight prospective jurors answered that even if the facts and the law justified the death sentence, they could not impose the death sentence. These jurors were excused.
It is not error to excuse jurors from the guilt phase of a capital murder prosecution who indicate inability to vote for death penalty under any circumstances. Cabello v. State, 471 So.2d 332, 345 (Miss. 1985). A "prospective juror may be struck if the juror indicates that he or she cannot consider and decide the facts impartially or cannot conscientiously apply the law or the court's instructions. The juror need not expressly state that he or she absolutely refuses to consider the death penalty; an equivalent response made in any reasonable manner which indicates that the juror's position is firm will suffice." Id. Compare Willie v. State, 585 So.2d 660, 672 (Miss. 1991) ("prospective juror may not be struck from the jury venire for cause simply because the juror voiced general objections to the death penalty or expressed conscientious or religious scruples against infliction of the death penalty").
The jurors who were excused did not simply voice general objections to the death penalty or say that even though they had scruples against the death penalty that they would be able to follow the law. They stated that they could not vote for the death penalty, even if the law and facts justified the penalty. The trial court did not err when it excused the jurors. In addition to being waived, this contention has no merit.

2. WHETHER THE STATE'S VOIR DIRE WAS CONFUSING, PREJUDICIAL, AND ERRONEOUS?
Mack contends that the prosecutor gave a confusing, prejudicial, and erroneous definition of conscientious scruples to the jurors. Mack argues that the State sought a commitment of how the jurors would vote and presupposed that having conscientious scruples is synonymous with an absolute inability to vote for death and confused the veniremen. Mack argued that an individual's conscience is bound to come into play when making any life or death decision, regardless of his or her beliefs about capital punishment, but this does not constitute "conscientious scruples" against the imposition of the death penalty. Mack contends that the combined effect of the confusion created by the State and the judge's statements deprived him of an impartial jury. Mack asserts that the definition of conscientious scruples and comments confused jurors and that this confusion was compounded by the court's effort to elicit only that answer which would disqualify the juror.
During the state's voir dire in the present case, the prosecutor made the following statement:
Mellen: ... [I]t is kind of generally speaking  conscientious, it goes to your conscience, deep down for some reason, morally, ethically, or for some reason inside you have scruples against it. That means you've got feelings deep down against the death sentence ... Let me be just straight out. If you are selected on that jury, then you would be sitting in this jury box and if the States proves it [sic] case, that is guilt, then you would have to decide to give death or not. You would.
Court: They could decide either way, counsel.
Mellen: I thought I said "could". Do you understand that? Now, having said that, and I'll go back to that same question that the Court did about conscientious scruples, if there is someone who has conscientious scruples against the infliction of the death sentence where the law and the facts would justify the death sentence in this case, which you could not vote for death. Is there anybody  (juror raises hand) all right. You raised your hand yesterday. Is there anybody new? (Juror raises hand).
*1303 When the court asked the two jurors who raised their hands whether they would automatically vote against the death penalty, both said, "Yes, I would because I've got a conscience." In inquiring "further whether the juror[s] would follow its instructions and [render] a fair verdict according to the law and the evidence" Gray v. State, 472 So.2d 409, 421 (Miss. 1985), rev'd on other grounds, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987), the court asked: "Well, you don't have to give me why, just tell me whether you would automatically vote against it regardless of the facts and the law; is that correct?" Both jurors stated that they would automatically vote against the death penalty. The court properly excused these prospective jurors.
There was no objection lodged at the time that the question was posed and the point is, therefore, waived. Cannaday v. State, 455 So.2d 713, 718-19 (Miss. 1984). In addition to being waived, there is no merit to this contention.

3. WHETHER THE COURT ERRED BY NOT ALLOWING MACK TO REHABILITATE THE PROSPECTIVE JURORS?
In this sub-issue, Mack contends that the trial court erred when it excluded the potential jurors without permitting him to question them in a rehabilitative effort. Mack concedes, however, that the prospective jurors, who were excused on the court's initiative, were not excused until after both the State and defense conducted voir dire of the panel. Mack relies on Balfour v. State, 598 So.2d 731, 754 (Miss. 1992), for the proposition that the parties are entitled to further examination of prospective jurors, supplemental to that of the trial judge. The State does not respond to Mack's argument.
Balfour is distinguishable from the instant case. In Balfour, the potential juror expressed reservations or concerns about the imposition of the death penalty. There was more than a slim chance that the juror could have been rehabilitated based on answer: "I could follow  if I understood  if I'm understanding clearly, I could follow  I could read it, but it would still more or less be life imprisonment." Id. at 756. Conversely, in the instant case, the jurors stated that they could not set aside their belief and apply the law and that they would automatically vote against the death penalty. There is only a slim likelihood that the defense could have rehabilitated them. Hansen v. State, 592 So.2d 114 (Miss. 1991).
Mack also argues that the court should have allowed him to use hypotheticals to rehabilitate the jurors, who stated that they would automatically vote against the death penalty, even if the facts and law justified its imposition. In requesting the use of the hypotheticals, the following colloquy transpired:
Court: Now, counsel, I think we have got a number right now that ought to be released on the conscientious scruples that came through clearly and that said they would automatically vote against the death penalty, and I don't know if counsel is going to make a perjurer out of them or not, but it is not that many. In fact, it is 
Pearson:  (interposing) Your Honor, what I propose to do on behalf of the defendant is to submit to them a hypothetical situation of facts that I think would justify the death penalty and ask them if they would refuse to vote for the death penalty in that kind of situation.
Court: We don't submit hypotheticals in voir dire, Mr. Pearson. That's one thing that the Court tells them that counsel will not do 
Pearson:  Not as to this case, Your Honor. An example would be that assume that you are sitting on the jury and it has been proved to you that this defendant butchered up two little girls in 1988, cut their body parts up and fed them to the hogs. In 1989, he butchered up two ladies and threw their bodies in the dumpster and in 1990 he killed a guard at the penitentiary.
Court: Well, if you want to tell them that he did all of that, I'll be glad for you to do that.

*1304 Pearson: Not for this man, but in a hypothetical  under those situations would you still refuse to vote for the death penalty and if they say, yes, I will still refuse to vote, I think they are clearly not qualified.
Court: But, Mr. Pearson, I am not going to let you go into hypotheticals, particularly 
Pearson:  All right. We just wanted to put it on the record.
Court: There may be some others that come up after counsel has voir dire (sic) that have conscientious scruples, but counsel usually everyone that I have ever done  I don't remember anyone that I have ever done, voir dired in a death penalty case, where the jurors were as emphatic about automatically voting against the death penalty as these few, and it is very few. But if you want to voir dire them  but as long as they tell me under the Court's questions and I believe those questions came right out of one of the U.S. Supreme Court cases, unless it has been changed. In fact, I think the second question is probably unnecessary but I ask when they say they have conscientious scruples but there was a U.S. Supreme Court case, I think, that mentions that and probably the reason they mentioned that  "Would it affect your death penalty or would it affect your guilt phase vote," and there are some states and I believe Texas is one that it doesn't take all twelve for the death penalty, so if this were a state that didn't take all twelve for the death penalty, the second question, that is, would it affect their guilt phase vote, would be an appropriate question, where all twelve weren't required or where in some states where the judge determines the death penalty. That second question that I ask whether that would affect their verdict in the guilt phase. See, there are some states, as I understand it, the judge determines that and if the juror knew that it might affect their vote in the guilt phase. Under ours I don't really think that it matters. We could probably go directly to question number three, because it still requires a unanimous vote of all the jurors.
Pearson: Your Honor, our position is that merely having conscientious scruples against the infliction of the death penalty does not disqualify a juror. It is only when 
Court:  Wait a minute, counsel. I went further. I am just talking about those who just said they would automatically vote against it regardless of the facts and the law.
Pearson: Yes, sir, I misunderstood what you were saying. I am aware of the questions that you asked, but I do think that we are entitled to go into that. Your questions were correct that if the facts justified the death sentence would you vote for it and they said, no. But I think I am entitled to really explain and demonstrate to them what is meant when the facts justify it and I think I am entitled by showing an extreme situation where anyone that would vote a death penalty would vote it in that type of case. And if they would still refuse to vote it in that type case, then I agree they would not be qualified.
Court: I am not going to get into other cases like the serial killers somewhere else, you know, you are not going to use those hypotheticals. I am not going to do that.
Pearson: All right. We would merely like 
Counsel:  (interposing) Unless counsel for the State agreed.
Mellen: No, sir.
Pearson: We would merely like for the record to reflect that we did propose to do that and it is Your Honor's rule that we cannot pursue that.
* * * * * *
Court: I don't know of anything that can be any stronger than that  "Would you automatically vote against it regardless of the facts and the law." Isn't that what I have said?
Pearson: Yes, sir, Your Honor, it is. But I do think perhaps if they could consider *1305 what you are talking about when they only hear "if the facts justify it," that doesn't give them the opportunity to consider a sample situation in their minds and if they would return a verdict of a death penalty in any type factual situation, then that would qualify them as a juror.
Court: Well, you are asking the question would they ever return a verdict of  they have already told me that they have conscientious scruples and they would automatically vote against it.
Pearson: Yes, sir.
Court: We are not going to get into talking about some other crimes somewhere else.
Pearson: All right, sir. * * * *.
Mack complains that the trial court restricted his right to question the prospective jurors about their ability to be fair and impartial by denying him the opportunity to voir dire them through the use of hypotheticals. Under section 13-5-69 of the Mississippi Code Annotated, the defense counsel has the right to ask questions of the jurors, who the court purports to excuse for cause. However, Rule 5.02 of the Uniform Criminal Rules of Circuit Court Practices provides that counsel may not propound hypothetical questions that would require the jury to pledge a particular verdict.
Here, it cannot be said with certainty that defense counsel purported to transgress this rule. Rather than seek a pledge, defendant seemed interested in using hypotheticals to determine whether the prospective jurors would consider the death penalty under any circumstances. The record indicates, however, that the court allowed defense counsel to rehabilitate the jurors through other questions. In fact, counsel rehabilitated Juror Banks and the court denied the state's challenge for cause. Counsel's hypothetical was mischaracterized as one offending Rule 5.02. Trial courts have a responsibility to control voir dire but in doing so they must take care not to hinder a full exploration of a juror's predispositions, by hypothetical or otherwise. Dennis v. United States, 339 U.S. 162, 171-72, 70 S.Ct. 519, 523-24, 94 L.Ed. 734 (1950). Nevertheless, it does not appear that the court committed reversible error during voir dire here, because trial counsel was allowed to accomplish full exploration by other means. This assignment of error is without merit.

D.

WHETHER VOIR DIRE WAS CONSTITUTIONALLY SUFFICIENT, SINCE THE COURT DID NOT QUALIFY PROSPECTIVE JURORS ON THE REVERSE  WITHERSPOON ISSUE.
Mack contends that the trial court should have asked both the life qualifying questions and the death qualifying question. Mack argues that the trial court overemphasized the questioning relating to people who had conscientious scruples against the death penalty, without placing the same amount of emphasis on those who favored the death penalty. Mack concedes, however, that persons seated in the jury box, on the front row and in the second row were "fleetingly" asked whether they would automatically vote for or against the imposition of the death penalty. However, he asserts that these questions asked by the court were disproportional when compared to the death qualification questions.
This claim was not preserved for review because Mack did not object at trial to the conduct of the voir dire on the subject of those who would automatically impose the death sentence. Cole v. State, 525 So.2d 365, 370-71 (Miss. 1987). In addition, the trial court in no way prohibited Mack from questioning the jury on this subject and the defense questioned the venire as to whether or not they would automatically impose the death sentence.
Here, the record indicates that during the defense's voir dire, the following colloquy took place:
Pearson: All right, let me put it another way then. You know there is an old saying *1306 "take a life, give a life." And a few people believe that way, just like a few people don't ever believe in the death penalty. How many of you subscribe to that belief "take a life, give a life," if he took some person's life he ought to give his own life. How many of you believe that, on the jury panel here? (Jurors did not respond.) How many in this section believe that if he took a life he should forfeit his life? Do any of you believe that? (Jurors did not respond) How many in the panel out to my right in the audience? How many of you believe that automatically you would vote for the death penalty if a person is convicted of murder? (No response from these jurors.) How about in the center section? Is there anyone here that would automatically vote for the death sentence if a person is convicted of murder? (Juror raises hand).[3]
In addition, the defense counsel asked the life-qualifying questions that he is now asserting that the trial court should have asked. The answers that the jurors gave in response to the court's voir dire were substantially clear. There is nothing in the record to indicate that the court's voir dire of the venire on the death-qualification prejudiced the defense. Moreover, the record indicates that the defense counsel gave sufficient treatment to the "life qualification" or the reverse Witherspoon question. This assignment of error is without merit.

E.

WHETHER THE TRIAL COURT ERRED IN CONDUCTING A CRITICAL STAGE OF THE PROCEEDINGS OUTSIDE THE PRESENCE OF THE DEFENDANT?
Mack contends that he was not afforded the right to be present at a critical stage of the proceedings. Mack argues that during a pretrial motion hearing, he exited the courtroom and that rather than recessing until he returned, the court proceeded with the hearing. Mack cites State v. Hamilton, 184 W. Va. 722, 403 S.E.2d 739, 743 (1991) and People v. Dokes, 79 N.Y.2d 656, 584 N.Y.S.2d 761, 763, 595 N.E.2d 836, 838 (1992), for the proposition that the defendant's right to be present at all critical stages of a criminal prosecution "is constitutional in nature and fundamental to the defendant's right to a fair trial."
Not only is the instant case distinguishable from both Hamilton and Dokes, the court in Dokes specifically notes that the defendant has no right to be present at a conference on jury instructions. 584 N.Y.S.2d at 763-64, 595 N.E.2d at 838-39. In Hamilton, the defendant stated that he did not know that he had the right to be present at the jury selection. 403 S.E.2d at 743. Moreover, during the selection, his attorney, in waiving the defendant's right, stated that the defendant was living in another county and could not be reached by phone. Id. In addition, the defendant in Hamilton, was absent from a jury selection process and not from a conference on legal matters. In Dokes, the defendant was absent from a hearing on factual matters, and not a conference of purely legal matter. 584 N.Y.S.2d at 763, 595 N.E.2d at 838.
In the instant case, Mack was absent from a portion of the conference on jury instructions. *1307 As distinguished from Dokes and Hamilton, Mack voluntarily left the room to go to the bathroom during a pre-trial discussion of the jury instructions. Mack did not request a brief recess nor object to the court continuing without his presence. United States v. Gagnon, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).
Moreover, discussions on purely legal matters are not critical stages of the proceedings. United States v. Sherman, 821 F.2d 1337 (9th Cir.1987); United States v. Graves, 669 F.2d 964 (5th Cir.1982). The United States Supreme Court has determined that a criminal defendant "is guaranteed the right to be present at any stage of the criminal proceedings that is critical to its outcome if his presence would contribute to the fairness of the procedure." Kentucky v. Stincer, 482 U.S. 730, 745, 107 S.Ct. 2658, 2667, 96 L.Ed.2d 631 (1987).
This Court has not addressed the question of whether the conference on jury instructions is such a critical stage of the proceedings. However, in Myers v. State, this Court discussed the absence of the defendant from the courtroom during discussions on jury challenges and a motion for a new trial. Myers v. State, 268 So.2d 353, 357 (Miss. 1972). The defendant argued that his absence from the two in-chambers conferences attended by court and counsel requires reversal. Myers, 268 So.2d at 357. The Court held that "[s]ince the absence of appellant from the anteroom was voluntary, the right to be present during that particular phase of the trial was waived." Id. at 358.
Although this Court has not addressed this issue, the jurisdictions which have addressed it, have held that a defendant has no constitutional right to be present at a conference which deals with legal issues, such as a conference on jury instructions. Mack's presence was not necessary to contribute to the fairness of the procedure, therefore, his absence did not violate due process. There is no merit to this contention.

F.

WHETHER JIMMIE MACK WAS DENIED A FUNDAMENTALLY FAIR TRIAL BY AN IMPARTIAL JURY WHERE THE JURY WAS EXPOSED TO INADMISSIBLE, PREJUDICIAL EVIDENCE DUE TO THE TRIAL COURT'S ERROR IN FAILING TO INSTRUCT THE VENIRE NOT TO READ NEWS ACCOUNTS OF THE TRIAL AND IN FAILING TO REMEDY THIS ERROR BY PURGING THE TAINTED VENIRE MEMBERS?
Mack contends that he was denied a fundamentally fair trial by an impartial jury because two of the jurors were exposed to news accounts of the crime. This claim arises because at the conclusion of the first day of jury selection, the trial court noticed that it failed to give the venire a cautionary instruction against watching television news accounts or reading newspaper articles about this case. Mack contends that upon questioning the venire the next morning, the trial court should have purged the venire of all possible jurors who might have been tainted by the media. Specifically, two of the twelve jurors who were selected to try this case admitted that they had read a newspaper article concerning this case on that first night of jury selection. Mack contends that the jurors learned from the newspaper article that he was an "escapee" at the time that the murder in question was committed, which prejudiced his case since the evidence of his status as an "escapee" was not going to be allowed in the trial.
In United States v. McKinney, 429 F.2d 1019, 1027 (5th Cir.1970), the Court stated:
In deciding the issue, we note at the outset that when possibly prejudicial newspaper articles have been published before the trial, as they were in this case, the defendant's counsel are also under a duty to see that potentially prejudicial influences are fully explored during the voir dire examination of prospective jurors. It would be an aberration in the administration of criminal justice if counsel for a defendant could simply remain silent about the problem of pre-trial publicity during the voir dire examination and then assert the existence *1308 of the publicity for the first time after an adverse verdict.
During the court's voir dire in the instant case, both Holmes and Bearden stated that, if they were selected as a member of the jury, they could return a verdict based solely on the testimony and evidence, and would not give any weight or even consider what they read. The jurors' promises to follow the law "must be given considerable deference." Porter v. State, 616 So.2d 899, 906 (Miss. 1993) citing Scott v. Ball, 595 So.2d 848, 850 (Miss. 1992). Prospective jurors "who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released." Armstrong v. State, 214 So.2d 589, 593 (Miss. 1968), citing Shell v. State, 554 So.2d 887, 893 (Miss. 1989); Billiot v. State, 454 So.2d 445, 457 (Miss. 1984).
During the point of the jury selection process when jurors Nos. 27 and 28 were presented to the defense, Mack had three peremptory challenges remaining. Furthermore, at the conclusion of the jury selection process, Mack had one remaining peremptory challenge. However, Mack neither used a peremptory challenge to excuse the jurors nor did he request that these jurors be excused for cause. This Court has held that when the defendant fails to timely challenge the juror, either for cause or peremptorily, he waives the point. Jaco v. State, 574 So.2d 625 (Miss. 1990); Ratliff v. State, 515 So.2d 877, 880 (Miss. 1987) (when at trial the appellant had not challenged any of the jurors for cause, he can not later complain of the composition of the special venire from which the jury was selected); Hansen v. State, 592 So.2d 114, 129 (Miss. 1991) ("[b]efore an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he utilized all of his peremptory challenges.") citing Berry v. State, 575 So.2d 1, 9 (Miss. 1990).
This assignment of error is without merit.

G.

WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF JIMMIE MACK'S FLIGHT FROM AUTHORITIES?
Mack first contends that the trial court erred in admitting evidence of his flight from authorities. Before trial, Mack filed a motion requesting, among other things, the suppression of all evidence of crimes other than those charged in the indictment. In response, the trial judge found as follows:
1. Evidence of defendant's escape from the Bolivar County Correctional Facility on or about February 1, 1990; evidence of the truck in which the defendant was captured was a stolen vehicle, and evidence of prior convictions of the defendant shall not be mentioned, in any way by the State in presenting its case-in-chief unless the said evidence becomes admissible during the course of the trial and the Court determines that admissibility.
2. Evidence regarding the capture of the defendant, i.e., the alleged shooting from the truck by the defendant at the law enforcement officers and evidence that the defendant and other person allegedly purchased illicit drugs shall be admissible at the trial when and if the proper predicate is laid for the admission of said evidence.
At trial, the trial judge admitted the testimony of several witnesses detailing Mack's flight from authorities. Mack contends that the trial judge erred in admitting evidence of his flight because the probative value of such evidence was substantially outweighed by its prejudicial effect.
Mack relies on Fuselier v. State, 468 So.2d 45 (Miss. 1985), in support of his contention that even though evidence of flight may be admissible as an exception under Mississippi Rules of Evidence 404(b), evidence of flight is not admissible when, in addition to being probative of guilt or guilty knowledge, it also is probative of escape.
In Fuselier the defendant jumped out of a back window when authorities arrived at his friend's home to arrest him on a capital murder charge. At the time of his arrest, Fuselier was an escapee from the Louisiana *1309 State Penitentiary. On appeal, he argued that evidence of flight was not probative of his guilt or guilty knowledge of Mrs. Gunter's murder because, as an escapee, he had an independent sufficient reason to flee. Id. at 57.
This Court reasoned that "Fuselier was obviously put in a no-win situation by either being required to explain his flight and the fact that he was a prison escapee or not explaining the flight and subjecting himself to a flight instruction." Id. at 57. The Court held that the flight instruction should not have been granted because the court was aware of an explanation for Fuselier's flight, but the jury was not. Id. at 57.
Conversely, the State argues that Mariche v. State, 495 So.2d 507 (Miss. 1986), Jimison v. State, 532 So.2d 985 (Miss. 1988), and other cases recognizing evidence of flight or escape as an exception to MRE 404(b) control.
Mississippi Rules of Evidence 404(b) provides:
Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Although evidence may be admissible for purposes other than to prove that a defendant acted in conformity therewith, such evidence must be filtered through Mississippi Rule of Evidence 403. Ford v. State, 555 So.2d 691 (Miss. 1989). Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
The facts of the instant case more closely resemble those of Fuselier than those of Mariche or Jimison. Like the defendant in Fuselier, Mack was charged with capital murder. Similarly, at the time of his flight, Mack, like Fuselier, was an escapee. Additionally, Mack was driving a stolen vehicle. Because such evidence was probative of other crimes or bad acts, it is not admissible under Rule 404, unless it falls within one of the exceptions of 404(b). Though admissible as an exception to 404(b), such evidence must be filtered through Rules 403 and 401 before it can be introduced to the jury. Ford, 555 So.2d at 695.
Here, the trial judge erred in finding that evidence of Mack's flight was admissible because Mack had two other reasons for fleeing: he was an escapee and he was driving a stolen vehicle. Under such circumstances, Fuselier would have prevented the prosecutor from instructing the jury that it could draw an inference of Mack's guilty or guilty knowledge of Mack's flight.
This court has permitted flight instructions in cases where there is evidence of flight and there are no independent reasons for flight. See Mariche and Jimison. In those cases, the jury was instructed that it could draw inferences of the defendants' guilt from the evidence of the defendants' flight. However, in Fuselier, this Court found that the flight instruction should not have been given because the Court was aware of independent reasons for the defendant's flight. Although this Court did not explicitly state that evidence of flight is inadmissible when independent reasons exist to explain the flight, it implicitly did so. As the Court pointed out in Fuselier "If Fuselier's flight is probative of his guilt or guilty knowledge of the Gunter murder, it is equally probative of his escape." In such instances, it follows that where evidence of flight is probative of things other than guilt or guilty knowledge of the crime charged, such evidence should be excluded. This goes to the heart of Rule 403, which permits the trial court to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial effect.
Though the prosecutor offered evidence of Mack's flight, it did not offer an instruction *1310 on flight. However, the jury was allowed to draw the same inference that this Court found that the jury should not have been instructed to draw in Fuselier. If a prosecutor cannot give a jury instruction on flight because evidence of flight is probative of things other than the defendant's guilt or guilty knowledge, it follows that the prosecutor should not be allowed to place the evidence before the jury. There was no flight instruction. However, in closing argument, the prosecutor stated:
And how do we know that Jimmie Mack did the killing, because he just about said he did. Who was the one that went down the road with that pistol firing out of the window when he was being followed? Who was the one driving the truck? ... Who was the one that jumped out of that truck when he was being followed and after those tires were blown out, three of them, and running down the road on three blown out tires and jumped out of that truck after having fired at the police and said "Shoot me, MF." And he is the same one that went ... running down the road and ran from the sheriff and he got that pistol that he had stolen from Mr. Fulton and started firing at the police who were after him for committing the crime that he had just committed a couple of hours before.
Here, it is clear that Mack's flight was probative of his guilt or guilty knowledge. But it was also probative of his status as an escapee. Mack's flight was a prejudicial fact having no evidentiary value in the determination of Mack's guilt of the offense here charged. To paraphrase the Fuselier Court to the extent that "[Mack's] flight [was] probative of his guilt or guilty knowledge of the [Fulton's] murder, it [was] equally probative of his guilt of escape."
The state argues that, even if the trial court erred, the error was waived because Mack failed to make a contemporaneous objection. Cole v. State, 525 So.2d 365, 369 (Miss. 1987).
Mack objected when the prosecutor began to elicit testimony of flight from the officers involved in the chase. His objection was overruled. When the prosecutor commented on Mack's flight during closing argument, Mack did not object. Because Mack did not object to the prosecutor's comments, the state argues that the error was waived.
The State's contention must fail. Mack's objection to the introduction of the flight evidence was sufficient to preserve the error for appeal. In the instant case, the objection was contemporaneous as is required by state law. Even though the objection was contemporaneous, it was overruled by the trial court. There is no reason to believe that Mack's objection to the prosecutor's comments on the flight evidence would have met a different fate had Mack raised a contemporaneous objection. Webb v. Priest, 413 So.2d 43 (Fla. 3d DCA 1982). Additionally, it would be a waste of the court's time to require a party to repeatedly raise objections to evidence where the trial court has already overruled one objection pertaining to the evidence at issue.
Allowing the flight testimony was error and that error is properly preserved for review by this Court. We conclude, however, that the error in admitting this evidence was harmless beyond a reasonable doubt. Mack's two companions testified that Mack killed Fulton. Mack was placed at the scene of the murder by other witnesses. Mack told Fulton's neighbors not to go near Fulton's home. There was blood on the truck that Mack was driving, which Mack attempted to wipe off. Mack threatened to kill a teen-ager if the youngster mentioned what he had seen. The evidence of Mack's flight pales in comparison to more direct evidence of guilt. Its admission under the circumstances was harmless error. Miss. R.Ev. 103(a).

H.

WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE AND ARGUMENT OF OTHER CRIMES AND WRONGS IN VIOLATION *1311 OF THE MISSISSIPPI CONSTITUTION, LAW AND RULES OF EVIDENCE AND OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION?
Mack contends that the trial court should not have allowed the prosecutor to present evidence that he purchased and smoked cocaine on the evening of Fulton's murder. Mack argues that the underlying felony of robbery, if established, would have adequately explained Mack's motive for the murder.
Mack cites a string of cases in support of his argument, including Rose v. State, 556 So.2d 728 (Miss. 1990); West v. State, 463 So.2d 1048 (Miss. 1985); Mason v. State, 429 So.2d 569 (Miss. 1983); Johnson v. State, 416 So.2d 383 (Miss. 1982); Gray v. State, 351 So.2d 1342 (Miss. 1977) that evidence of other crimes is not admissible to show that a defendant committed crimes other than the one for which he is on trial.
Mack is correct as far as that goes. However, this Court in West pointed out that there are some exceptions to the general rule. The West Court stated:
There are certain recognized exceptions to the rule. Proof of another crime is admissible where the offense charged and that offered to be proved are so connected as to constitute one transaction, where it is necessary to identify the defendant, where it is material to prove motive and there is an apparent relation or connection between the act proposed to be proved and that charged, where the accusation involves a series of criminal acts which must be proved to make out the offense, or where it is necessary to prove scienter or guilty knowledge.
Id. at 1051; citing Johnson v. State, 416 So.2d 383, 386 (Miss. 1982), quoting Gray v. State, 351 So.2d 1342 (Miss. 1977).
If evidence that a defendant has committed a crime or other bad acts falls within a 404(b) exception, before admitting evidence of the crime or act, the trial judge must weigh the probativeness of the evidence against the prejudicial effect under Rule 403. In Ford, the Court said:
To be sure, evidence admissible under Rule 404(b) is also subject to the prejudicial test of Rule 403; that is, even though the Circuit Court considered the evidence at issue admissible under Rule 404(b), it was still required by Rule 403 to consider whether its probative value on the issue of motive, opportunity and intent was substantially outweighed by the danger of unfair prejudice. In this sense Rule 403 is an ultimate filter through which all otherwise admissible evidence must fall.
555 So.2d at 693, citing Jenkins v. State, 507 So.2d 89 (Miss. 1987).
In Edlin v. State, 533 So.2d 403, 408 (Miss. 1988), this Court set out the burden that must be met for admitting evidence under Rule 404(b). In Edlin, the Court adopted the view expressed in 2 Weinstein's Evidence, paragraph 404(08), pages 404-53 to 404-54 (1986). The proponent must (1) identify the consequential fact to which the proffered evidence of other crimes, wrongs, or acts, and (2) prove the other crimes, wrongs, or acts and (3) articulate precisely the evidential hypothesis by which the consequential fact may be inferred from the proffered evidence. Once the evidence has met this burden it must also pass the Rule 403 balancing test. That is, the probative value must substantially outweigh the prejudice to the defendant.
In the instant case, the prosecutor argues that the state satisfied the Edlin test. The colloquy between the prosecutor and the court is set forth below.
BY MR. MELLEN: Yes, sir, dealing with several crimes. The crime I think that we are talking about and we've gotten already the matter of the pistol, we've gotten the matter of shooting and the escape and all of that  we've gotten that in. The only thing that I can think of now other than the prior convictions of the defendant is a matter of his having purchased and we *1312 would say that the evidence would tend to show with money that got from the deceased some cocaine when he went to Mound Bayou. So this would be immediately thereafter.
BY THE COURT: Now, let me find out if I am correct in this. I believe we talked earlier about you talking about to get money. Doesn't that come before purchasing. Do you intend to offer anything about 
BY MR. MELLEN:  Oh, yes, sir.
BY THE COURT: Well, I mean that comes before purchasing doesn't it? It comes before the crime itself.
BY MR. MELLEN: Well, that is what I said "with money that they got from the deceased." We, or course, are going to say that he took money from the deceased. He had actually bought some cocaine that afternoon and had used that cocaine and did not have enough money to buy anymore cocaine and went out to the Dawkins residence and asked for the $5 and then went immediately over there to Mr. Fulton's house, killed him, took money from his person. After stopping at the Dawkins again, went back into Mound Bayou, went to the source of cocaine, bought some more cocaine and smoked it. This is the other crime we are talking about and this is the motive we are going to say or the obvious motive for getting the money. He needed money and said he did and went out there and got it. That in a nutshell is the other crime we are talking about.
BY THE COURT:  Wait a minute. That is not before the Court. You've got to tell the Court what you intend to proffer.
BY THE COURT: By who and how?
BY MR. MELLEN: Judge, we have a fellow named Greg Hooper who was there in Mound Bayou. The defendant picked him up, took him over  Greg Hooper showed them where the cocaine could be bought. The defendant smoked his cocaine, didn't have enough money to buy anymore, said  I think he said "I'll be back," or something like that, but he left. The two people in the truck saw this take place.
BY THE COURT: Did they participate?
BY MR. MELLEN: No, sir. they went out to the  now one of them wanted to go see his daughter, his baby, in the hospital so that is why he was riding in the truck. So they went out there to the Dawkins house where the defendant asked for the $5 and then went over there and got the money. And after he got this money he went back out there. So these two individuals were in the truck and know that he did not have any money and then know they went back over there and purchased the cocaine with that money.
After the proffer, the trial judge issued his ruling. The trial court found:
That as proffered by the District Attorney that the evidence of buying drugs by the defendant and the effort to buy more drugs but without funds to do so and the evidence that he intended to return with the funds, intends to return to buy drugs would come under Rule 404(b) as a motive for or which might be considered the motive for the robbery which is the underlying offense to the murder. And under the Neal v. State [451 So.2d 743 (Miss. 1984)], in any event would fall into the series of transactions or occurrences, that is, for the motive... . Based on the proffer, the Court finds that the evidence is relevant under the exception of 404(b) relating to motive for the robbery, the underlying offense and that the probative value, that is, for motive is not substantially outweighed by the danger of unfair prejudice, part of the entire crime being the motive.
Here, the trial judge concluded that because the evidence of the purchase of drugs before and after the robbery was being introduced to demonstrate Mack's motive for the robbery, it was admissible under 404(b). The trial judge also found that the probative value of such evidence was not substantially outweighed by its prejudicial effect.
Contending that the trial judge did not abuse his discretion in admitting the evidence, *1313 the state points out that this Court has repeatedly held that "relevancy and admissibility of evidence are largely within the discretion of the trial court and this court will reverse only where that discretion has been abused." Hentz v. State, 542 So.2d 914, 917 (Miss. 1989).
Although it was within the trial judge's discretion to decide whether evidence of Mack's motive for robbing Fulton was relevant and thus admissible under Rule 404(b), Mack argues that the trial judge should not have allowed evidence of why he needed money to be presented to the jury.
There is no Mississippi case on point. In Massey v. State, 826 S.W.2d 655 (Tex. App.Waco 1992), the Court held that co-defendant's testimony that he and defendant were smoking "crack cocaine" prior to robbery and purchased additional cocaine after robbery was admissible to show defendant's motive.
The Texas Appeals Court found that the trial judge did not abuse his discretion. "Bearing in mind that evidence of an extraneous offense is inherently prejudicial," we do not find in the record that Appellant pointed out the nature and degree of the prejudice that he claimed would result from the admission of the evidence of his motive. Because the State had no other evidence by which to prove motive and Fryback's testimony about the motive was compelling in nature, we cannot say that the court abused its discretion in determining that the probative value was not substantially outweighed by the danger of unfair prejudice and in overruling appellant's objection to the evidence of extraneous offenses." Id. at 659.
In Arizona v. Bojorquez, 151 Ariz. 611, 729 P.2d 965 (App. 1986), the appellate court found that evidence of heroin and heroin paraphernalia found on defendants at time of their arrest was not admissible to show defendants motive for robbery under Rule 404(b). The court pointed out that Arizona courts have also recognized an exception where the other bad acts "complete the story" of the offense. The court found that the heroin evidence was inadmissible because it "did not complete the story of the robbery, rather it was evidence of a completely separate criminal action whose only purpose could be to prejudice the jury." Id. 729 P.2d at 967. See State v. Wirtanen, 117 Ariz. 129, 571 P.2d 275 (1977). The court noted that some courts "have allowed the evidence of heroin use to come in, but only where it is supported by sufficient foundational evidence regarding the defendant's addiction, the cost of heroin, and the financial resources of the defendant." There was no evidence linking the money stolen from the victim and the heroin found on Boroquez.
In the instant case, it is clear that Mack robbed Fulton because he needed money for cocaine. There was testimony from several witnesses that Mack smoked cocaine the morning of Fulton's murder. There was also testimony that Mack wanted to purchase more cocaine but did not have the funds to do so. Additionally, there was testimony that after robbing Fulton that Mack purchased more crack cocaine.
This is an area fraught with danger, and prosecutors and trial courts alike should approach with caution any evidence of other crimes offered for the purpose of proving motive for a robbery. Robbery has its own motive  the attainment of something of value. It matters not whether the perpetrator is poor seeking the cost of a meal, or rich in search of a thrill. The use to which that value is put or to be put ordinarily has no relevance. Here, because of the close connection of a specific monetary objective and because of the overwhelming evidence of guilt, we conclude that the error in admitting this evidence, if any, is harmless beyond a reasonable doubt.

I.

WHETHER THE INTRODUCTION OF INFLAMMATORY PHOTOGRAPHS OF THE VICTIMS WITHOUT EVIDENTIARY PURPOSE OF THE PROBATIVE VALUE VIOLATED JIMMIE MACK'S RIGHTS PURSUANT TO MISSISSIPPI LAW AND THE DUE PROCESS *1314 CLAUSE OF THE FOURTEENTH AMENDMENT?
Mack contends that exhibits 10, 11, 12, 14, 15, 33, and 34 should not have been admitted into evidence because the photographs were inflammatory, repetitive, and cumulative.
"When deciding on the admissibility of gruesome photos, trial judges must consider: (1) whether the proof is absolute or in doubt as the identity of the guilty party [and] (2) whether the photos are necessary evidence or simply a ploy on the part of the prosecutor to arouse the passion and prejudice of the jury." McNeal v. State, 617 So.2d 999, 1011 (Miss. 1993).
In Hurns v. State, 616 So.2d 313 (Miss. 1993), the photographs there in question were introduced during the pathologist's testimony concerning the scientific cause of death.
Although this Court held that the trial judge in Hurns did not err in admitting the photograph, as corroboration of that testimony, it warned prosecutors about the use of and reliance upon such photographs. "Few autopsy photographs will meet the criteria of containing more probative value, as compared to being unfairly prejudicial or inflammatory, or overly gruesome." Id.
In Alexander v. State, 610 So.2d 320 (Miss. 1992), in 1988, Alexander was convicted of killing her dormitory suitemate. This Court, in affirming the conviction, found that the trial court did not err in admitting a gruesome autopsy photograph, depicting the victim's open skull, to show the cause of death.
Two of the photographs in the case at bar are similar to the pictures in Hurns and Alexander. Exhibit 33 showed tissue which had been removed from Fulton's head revealing Fulton's skullcap and fractures to the cranial bone. Exhibit 34 showed the top of head cut open, revealing the entire cranial cavity and a pair of scissors inside the head in the bloody bony tissue on which the brain would normally rest. Like the photographs in Hurns and Alexander, these, were used to establish Fulton's cause of death as craniocerebral trauma secondary to blunt force trauma. The photographs also were illustrative of the extent of damage that caused Fulton's death and were introduced while Dr. Haynes was testifying. The pathologist's explanation was corroborated by Monroe and Washington, both of whom testified that Mack struck Fulton repeatedly in the head with an iron pipe. Mack testified that he slapped Fulton.
Other photographs showed Fulton's body at the scene, while exhibits 14 and 15 showed his body at the morgue. While the autopsy photographs were gruesome, they were not so gruesome as to be overly prejudicial and inflammatory. The photographs were probative and no error was committed in admitting them.

J.

WHETHER THE TRIAL COURT ERRED IN ALLOWING LAY WITNESS, BILLY JOE ESTES, TO GIVE HIS OPINION REGARDING FINGERPRINT EVIDENCE?
Mack contends that the trial court erred when it permitted Billy Joe Estes, chief investigator for the Bolivar County Sheriff's Department, to testify that he could not raise any fingerprints from a pipe that Mack used to strike Fulton. Mack raises this error even though it was Mack who questioned Estes about raising the fingerprints.
Mack opened the door for the prosecutor to question Estes on redirect as though he were an expert because the defense counsel on cross-examination accepted Estes' answer that he was an expert in the area of fingerprinting and questioned him as though he had been qualified and tendered as an expert. See, Hansen v. State, 592 So.2d 114 (Miss. 1991). There is no merit in Mack's contention that the trial court erred in this instance.

K.

WHETHER THE TRIAL COURT FAILURE TO DECLARE A MISTRIAL FOLLOWING *1315 THE PROSECUTOR'S VIOLATION OF RULE 4.06 DEPRIVED JIMMY MACK OF A FAIR TRIAL?
Rule 4.06 provides in pertinent part:
(a) Upon written request by the defendant, the prosecution shall disclose to each defendant or to his or her attorney, and permit him or her to inspect, copy, test and photograph, without the necessity of court order, the following which is in the possession, custody, or control of the State, or the existence of which is known, or by the exercise of due diligence may become known, to the prosecution:
(1) Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved, of each such witness and the substance of any oral statement made by any such witness.
Miss.Unif.Crim.R.Cir.Ct.Prac. 4.06 (emphasis supplied).
In West v. State, 553 So.2d 8 (Miss. 1989), this Court recognized that a prosecutor's duty to disclose does not end after the initial disclosure under Rule 4.06. Rather, the prosecutor has a "continuing duty" to disclose "additional material or information which is subject to disclosure" that he becomes aware of "subsequent to compliance with these rules or orders pursuant thereto." Id. at 16-17.
Here, Mack filed a motion for discovery before his pre-trial hearing was held. Among other things, Mack sought the discovery of the names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, as well as statements of witnesses, reports, and all written instruments in their files concerning the defendant.
The prosecutor submitted Derrell Dawkins' name as a potential witness but failed to inform Mack that Dawkins would testify that he heard Mack tell Kerry Reynolds that Mack would blow his brains out. At trial, Dawkins testified that he heard Mack tell Reynolds that "Uh, he told Kerry `If you say anything, I'll blow your brains out.'"
At the close of direct examination of Dawkins, Mack raised a motion to dismiss on the grounds that Rule 4.06 had been violated. In a conference before the trial judge, the prosecutor informed the court that "I talked to this witness and he made that statement and it is in my notes that he said that." However, he told the judge that he did not disclose the statement because he had informed Mack that Reynolds would testify about Mack's threat on his life.
The fact that the prosecutor informed Mack that Reynolds was going to testify that Mack threatened his life does not satisfy the prosecutor's duty to disclose the names and statements of all witnesses as requested by Mack. In addition to the initial disclosure, the prosecutor had a continuing duty to supplement.
As such, it is clear that the prosecutor violated Rule 4.06 because he was aware of Dawkins' statement, yet he failed to inform Mack. As the trial judge noted, the prosecutor should have supplemented the discovery when he learned that Dawkins heard the statement, especially when the prosecutor knew that he would call Dawkins to corroborate Reynolds' testimony about the threat.
The trial judge gave Mack an opportunity to interview Dawkins. After the interview Mack did not ask for a further continuance or make any other objection to proceeding. The state suggests that the 4.06 violation was therefore cured. Traylor v. State, 582 So.2d 1003 (Miss. 1991). In Galloway v. State, 604 So.2d 735 (Miss. 1992), however, we held that the opportunity for a brief interview does not always eviscerate a previous request for a continuance. "Some surprise evidence by its very nature may not be cured summarily." Id. at 739.
For present purposes, however, it suffices to observe that the error is harmless. Dawkins only confirmed what another witness said. The evidence of guilt was overwhelming without the rather ambiguous statement.

*1316 L.

WHETHER THE TRIAL COURT ERRED IN ALLOWING THE STATEMENT OF THE DEFENDANT TO BE ADMITTED INTO EVIDENCE IN VIOLATION OF ARTICLE THREE, SECTIONS 14 AND 26 OF THE MISSISSIPPI CONSTITUTION AND THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES?
Mack contends that law enforcement officials violated his Sixth Amendment to counsel by questioning him upon his arrest in the absence of his attorney, who had been appointed to represent him on an unrelated charge. Mack does not contend that Sixth Amendment right to counsel attached because he was in custody. Instead, Mack argues that his Sixth Amendment right to counsel attached because counsel had been appointed to represent him on an unrelated burglary charge.
In Balfour v. State, 598 So.2d 731 (Miss. 1992), this Court recognized, as the U.S. Supreme Court did in McNeil v. Wisconsin, 501 U.S. 171, 174-76, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158, 166-67 (1991) that a defendant's Sixth Amendment right to counsel is offense specific. It is clear under the court's holding in McNeil that Mack's invocation of his Sixth Amendment right to counsel on the burglary charge did not extend to the capital murder charge.
The only question is whether Mack waived his right to counsel on the murder charge before making a statement. Before Estes questioned him about his involvement in Fulton's murder, he advised Mack of his right to counsel. When asked if he understood his right, Mack answered in the affirmative. The following colloquy took place:
Q. Jimmy, I've explained the rights to you. Do you understand what they are?
A. Yeah.
Q. The above statement of my rights have [sic] been read and explained to me and I fully understand what they are. I am ready and willing to answer questions, make any statement without first consulting with a lawyer, have a lawyer present during questioning and waiving my right to remain silent, I wish to state that no promise or threats have been used against me. No persuasion or coercion (sic) have been used against me. Anybody threaten you in any way to give this statement.
A. Huh Uh.
Q. You gone have to speak up now. I can't.
A. Naw. Naw.
Q. You want to tell me what happened out there?
A. Ain't no happen.
Q. Huh?
A. Ain't nothing happening.
In accordance with Miranda, Mack was apprised of his right to counsel and had ample opportunity to invoke his right to counsel before he answered any questions asked by Estes. If Mack did not want to speak with Estes, he simply could have refused to answer the questions by invoking his right to remain silent or his right to counsel. There is nothing in the record that indicates that Mack ever requested an attorney, though he was apprised of his right to counsel.
The court did not err in allowing the statement to be introduced against Mack for impeachment purposes.

M.

WHETHER THE PROSECUTOR'S MISCONDUCT IN THIS TRIAL VIOLATED THE STATE AND FEDERAL CONSTITUTIONS AND DEPRIVED JIMMIE MACK OF A FUNDAMENTALLY FAIR TRIAL?
The defense contends that the prosecutor acted improperly during voir dire where he twice sought promises from potential jurors that they would return a death *1317 sentence. The transcript of the voir dire reflects the following:
BY MR. MELLEN: Now, the Judge asked a lot of questions yesterday, very thoroughly, concerning that. Now, you have had a night to think about it so there may be some responses this morning that wasn't there yesterday concerning this aspect of the trial. And I will get to that. But let me ask you this. When you decide guilty or innocence, can you do so, then, based on the facts and also based upon  there will be in an instruction that the Judge gives you at the end of the trial, if you are on that jury and you will hear this instruction, based upon your good common sense and your sound honest judgment. And when he says "your" he is talking about your individual judgment  good common sense and sound honest judgment. Do you agree to do that? Is there anybody who just wouldn't agree to do that? For instance, you get to thinking, well, this is such a great case. It's involving  may even get into the death penalty so I would hold the prosecution to a higher burden and I would find not guilty in order to not to get to get to that phase. Do you understand what I am saying? Is there anybody who would shirk their responsibility even if we prove the case beyond a reasonable doubt? Anybody who would shirk their responsibility? Then I take it that you, if we prove guilt of the crime, that you would find him guilty. Would you do that?
BY MR. WONG: Objection, Your Honor. This is asking for 
BY THE COURT:  I sustain the objection. They have already told the Court that they would follow the law, Mr. Mellen.
Later during voir dire, the following conversation also took place:
BY MR. MELLEN: Mrs. Key has answered. Is there anyone else in the jury box? Anybody in the courtroom? All right. Again I say this, if selected on the jury you would, if you find guilt in this case in which he is charged, then you would go into that second phase and the responsibility than would be on the jury concerning the sentence to be imposed. And my question is  of course, you do have the opportunity at that point  well, actually three things that you can do. You can impose the death sentence, you can impose a life sentence and you can impose nothing, at which time the Court has instructed you that it would be a requirement of the Court then to impose a life sentence at that point. Now, my question is this. If the facts in this case justify it and, of course, the law, then I want a jury that would, when seated up here, would not just exclude the death sentence because this is a unique type case. Do you understand? If you are seated on that jury, then that would be a point for you to consider, not only consider, but you are agreeing that you could, under the law you could impose the death sentence. Do you understand?
BY MR. WONG: Objection, Your Honor. I think this is a question in another form asking for a promise.
BY THE COURT: All right. Don't ask for promises. They have told the Court they could follow the law, counsel.
Mack relies on Stringer v. State, 500 So.2d 928, 938 (Miss. 1986), to support his contention that it is reversible error for a prosecutor to elicit promises from prospective jurors that they will return a particular verdict. If it is impermissible for a prosecutor to seek promises of a particular verdict, Mack reasons that it is also error for the prosecutor to seek promises from jurors that they will impose a particular penalty. While Mack correctly reasons that a prosecutor is prohibited from eliciting promises that a jury will impose the death penalty, it does not follow that a prosecutor cannot properly inquire into jurors' beliefs about the death penalty or inform jurors that the death penalty is among the forms of punishment available in a capital murder case.
"In a capital murder case, inquiry into the venire members' views about the death penalty *1318 is of critical importance to the state, the defendant and the court. It is the duty of all concerned to investigate those views thoroughly in order to assemble the most qualified jury." State v. Antwine, 743 S.W.2d 51 (Mo. 1987). Here, the prosecutor informed jurors of the available options should Mack be found guilty of murder. The prosecutor first tried to ascertain what prospective jurors would do if the prosecutor proved its case against Mack beyond a reasonable doubt. This inquiry did not elicit a promise that jurors would impose the death penalty. Instead, the prosecutor was attempting to ascertain whether after all the evidence has been introduced jurors would be able to put their personal feelings aside and follow the law, even if it meant that the result would be unfavorable to Mack.
Mack also contends that the prosecutor wrongfully elicited prejudicial responses from two witnesses. The following colloquy took place during the direct examination of Charles Washington:
Q. And where did you go then?
A. He took the old man and he drug him out there in the bushes and throwed [sic] him off in the bushes and covered him up. Then he backed back up there to his auntie's house. And he told his auntie that he had killed the old man, to not go down the street.
Q. All right. Now, you were still in the truck, weren't you?
A. Yes, sir.
Q. Did you hear the exact words he said down there?
A. No, sir. His auntie said it, said it in court.
BY MR. WONG: Objection, Your Honor.
BY THE COURT: Sustain the objection. The jury will disregard that statement.
On redirect examination of the chief of police, the following testimony was given:
Q. Now, Chief, I want to ask you concerning the truck, in your investigation, did you ever search the truck and go through any items that might have been in the truck or in the bed of the truck?
A. Yes, sir. I took statements from all three subjects that early morning, around 12:00 o'clock, or it might have been a little after. It looked like it was going to rain and I went out there and took a 
BY MR. PEARSON:  May we approach the bench, Your Honor?
BY THE COURT: All right.
WHEREUPON, THE ATTORNEYS APPROACHED THE BENCH FOR A BRIEF CONFERENCE OUT OF THE HEARING OF THE JURY.
(BENCH CONFERENCE)
IN THE HEARING OF THE JURY.
BY THE COURT: Ladies and gentlemen, you are to completely disregard the testimony from this witness as to the taking of three statements. That was totally unresponsive to the question asked of him.
Other than Stringer, Mack fails to cite any authority to support his claim that the prosecutor's questioning of Washington or the police chief resulted in reversible error. Mack attempts to stack the prosecutor's elicitation of prejudicial responses on the prosecutor's alleged effort to obtain promises that the jurors would impose the death penalty. That questioning was not error and thus cannot be combined with other prosecutorial misconduct to warrant a reversal.
Moreover, this Court also held that where the trial judge sustains appellant's objection to the testimony and instructs the jury to disregard same, prejudicial error does not result from that testimony. Shelby v. State, 402 So.2d 338 (Miss. 1981), citing Herron v. State, 287 So.2d 759 (Miss. 1974), cert. den., 417 U.S. 972, 94 S.Ct. 3179, 41 L.Ed.2d 1144.
Both statements complained of were unresponsive to the questions asked. As this Court pointed out in Bullock v. State, 391 So.2d 601 (Miss. 1980), reversible error does *1319 not occur where a witness' response is unresponsive to a question asked by a prosecutor, if certain procedures are followed. Id. at 609. Those procedures were followed in the instant case. Mack objected. The trial judge sustained Mack's objection and ordered the jury to disregard both statements.
Mack also contends that the prosecutor asked a clearly improper question of another witness.
Q. Do you know who that was?
A. No, I don't.
Q. Now, what I am asking you is this. Do you know that it was or was not or did you pay any attention as to who it was? Could it have been, for instance, Jimmie Mack 
BY MR. WONG:  Object, Your Honor.
BY THE COURT: I sustain the objection. She said he didn't know, counsel.
A.  That's probably who it was 
BY THE COURT:  I sustained the objection.
Q. Did you pay attention as to who it was?
A. No, I didn't.
Here, the trial court prevented the prosecutor's conduct from resulting in reversible error. When the prosecutor attempted to suggest that Mack was the person the witness saw coming out of Fulton's house, Mack objected. The trial judge sustained the objection on the basis that the witness had already told the prosecutor that she did not know whom she had seen at Fulton's house.
Mack also points out that the court had to admonish the prosecutor not to tell a witness how he wanted his question answered. The colloquy between the prosecutor and the witness was as follows:
Q. Are you sure about the pistol? Who did you see with the pistol?
A. Jimmie Mack.
Q. Did Charles Washington have that pistol  did you see him holding that pistol, shooting it 
A.  I seen him hold it.
Q. You saw him holding it.
A. That's when they went into the house. I ain't going to say who stole the pistol out of the house, but I seen Charles with the pistol and then he gave it to Jimmie Mack.
Q. Okay. Did Jimmie Mack show him that pistol and then he handed it back to Jimmie Mack 
A.  Yes.
BY MR. PEARSON: We object, Your Honor.
BY THE COURT: I sustain the objection. You can't tell a witness what you would like for him to answer and then have him say yes or no. And you can't cross-examine your witness.
BY MR. MELLEN: May I approach the bench, Your Honor.
Mack cites McDavid v. State, 594 So.2d 12 (Miss. 1992), in support of his contention that such errors on behalf of the prosecutor warrant reversal. In McDavid this Court reversed because the trial court allowed the prosecutor to repeatedly ask leading questions of witnesses. There is a key distinction between the instant case and McDavid. In McDavid the trial judge allowed the prosecutor to repeatedly ask leading questions and permitted witnesses to answer the objectionable questions. In the instant case, the defense attorney objected when the prosecutor suggested the answer to Washington on direct examination. The objection was sustained. As such, no error resulted from the objectionable leading question.
In addition to the alleged errors above, Mack argues that the prosecutor committed numerous instances of misconduct in closing arguments at both phases of the trial. First, Mack contends that during the guilt phase, the prosecutor defined the term "reasonable doubt" in a manner that allowed the jury to base its "finding of guilt on a degree of proof below that required by the Due Process Clause."
The state's closing argument follows:

*1320 BY MR. MELLEN: Thank you, your honor. That's exactly right. The instructions read and the law is that the State is obligated to prove to a jury before they can find guilt, prove to them evidence sufficient that it would be beyond a reasonable doubt and that includes the word "reasonable." It doesn't say every doubt. It says a reasonable doubt  a reasonable doubt. It says a reasonable doubt  a reasonable doubt. And the defense has argued up here and has made, for instance two comments: One is that when the truck was backed up there to the Dawkins' house, while it was there, the Defendant got out and that he, himself, was afraid because the two people in the truck had a shotgun. Now, is that reasonable? It didn't even have shells. And he knew that. He had stolen it. The argument was that he didn't have blood on his clothes. Well, he did, he didn't have a shirt because when he jumped out of that truck that night he got shot up in his shoulder. They took his shirt out there so the policemen didn't wind up with the shirt.
Mack cites Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), in support of the proposition that it is error for a prosecutor to define reasonable doubt. There the court held that a jury instruction defining "reasonable doubt" in terms of "grave" or "substantial" uncertainty and as "moral certainty" violated the due process requirement that criminal convictions be based on proof beyond a reasonable doubt.
There is nothing in this record to indicate the prosecutor attempted to define reasonable doubt, much less define reasonable doubt in a manner that contravenes with the Due Process Clause. The prosecutor merely emphasized the word "reasonable" without trying to contrast it with other words or otherwise elaborate upon it, assuming that he informed the jury of the state's obligation to prove guilt beyond a reasonable doubt. Because the prosecutor did not define reasonable doubt, Mack's contention must fail.
Additionally, Mack failed to object to the argument at trial. Even if the argument could be faulted, his failure to object would be fatal to his contention here.
Mack also contends that it was error for the prosecutor to argue in his personal "expert opinion" Jimmie Mack, and only Jimmie Mack, committed capital murder. Below is an excerpt of the prosecutor's closing remarks that Mack finds objectionable.
This is life and it may be a part of life that most of us don't see, but this is a part of life people indulge in. Hopefully, not everybody. Because we had, at least, one person at home that afternoon and he was dead within a few hours because there was some who were going for bad. And I don't apologize at all for these people. Percy Monroe. Charles Washington and the defendant over here, Jimmie Mack. That fact that I had to put on two of those witnesses, and I do not stand behind those witnesses to say that those people are good people at all. But they witnessed a crime and they were going for bad. And they were involved in all kinds of conflicting statements going on. But I do know this, the two of them were involved as accessories after the fact to capital murder. And what I need to stress to the jury is this, a crime was committed and that crime was capital murder. That crime was committed. And there were three people there when that crime was committed and two of them, at least, were involved as accessories after the fact and that evidence came out. They were charged with accessory after the fact of capital murder. And Jimmie Mack is the one that committed the capital murder. And what I am doing right now is trying to in your mind, at least, distinguish some crimes that were committed. One person picked up that bar and bashed Mr. Fulton's head in and killed him. And the evidence shows who that person is. The killer is Jimmie Mack.
Mississippi courts have long recognized that a prosecutor has a right to comment on the evidence. However, like other courts, this State does not allow a prosecutor to comment on his personal beliefs *1321 about a defendant's guilt or innocence. Jones v. Butler, 864 F.2d 348, 359-60 (5th Cir.1988); accord, Quinlivan v. State, 579 So.2d 1386 (Ala.Cr.Appl. 1991). A defendant's guilt or innocence is to be determined by a jury of his or her peers after the presentation of evidence.
Here, the prosecutor's repeated reference to what "I know" as opposed to what the state or "we" know may have suggested to the jury that the prosecutor had some information or knowledge that was not presented to the jury. The prosecutor overstepped his bounds in arguing to the jury. The prosecutor's comments would have been permissible comment had he not repeatedly used the pronoun "I." The use of "I" leaves open the inference that the prosecutor personally believed that Mack committed the capital murder.
That said, however, we find the error harmless in this instance.
Mack contends that in the sentencing stage, the prosecutor sought to assure the jury that it was not sending Jimmie Mack to the death chamber. In his closing argument in the sentencing phase, the prosecutor said:
"You are not asked to kill. You are asked to come up here and to express justice  justice. We ask for nothing in this courtroom but justice. And that would be justice because that man is gone. He lived almost 90 years and the lives he affected during that time are everywhere. His memory is around, but's he gone. But we deserve justice because of what was done that afternoon. Ladies and gentlemen, go back and do justice. Let justice resound from this courtroom this afternoon. He is guilty of capital murder. Let the penalty be commensurate with what Jimmie Mack did to Mr. Henry Fulton. Thank you.
In Caldwell v. Mississippi, 472 U.S. 320, 320, 105 S.Ct. 2633, 2634, 86 L.Ed.2d 231, 231 (1985), the U.S. Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." There the prosecutor made the following remarks in the state's closing argument of the sentencing phase of the Caldwell's trial:
ASSISTANT DISTRICT ATTORNEY:
Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know  they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet the . ..
COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.
ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.
THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.
ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said `Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.
The Supreme Court found that *1322 the "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance.
Here the prosecutor's remark did not rise to a level as to suggest to the jury that someone other than the jury had the power to decide Mack's fate. The prosecutor's comments never lead the jury to believe that the jury was not the final arbiter of Mack's destiny.
Such misconduct as was engaged in by the prosecutor did not rise to the level of reversible error.

N.

WHETHER THE TRIAL COURT'S INSTRUCTION TO THE JURY ON THE MANNER OF ITS DELIBERATIONS WAS UNDULY COERCIVE, IN VIOLATION OF THE STATE AND FEDERAL DUE PROCESS CLAUSE?
Mack contends that the trial court's instructions to the jury explicitly forbade any consideration of lesser-included offenses until the jury agreed unanimously to acquit the defendant of the capital charge. In pertinent part, the instruction read:
The Court instructs the jury that the defendant JIMMIE MACK, has been charged with the crime of capital murder of Henry Fulton.
If you believe from the evidence in this case beyond a reasonable doubt that:
(1) on or about June 20, 1990, Henry Fulton was a living human being, and
(2) the defendant, JIMMIE MACK, without authority of law and of his deliberate design to effect death, did kill and murder Henry Fulton,
(3) while engaged in the crime of robbery of Henry Fulton,
then you shall find the defendant guilty of capital murder.
If the State fails to prove beyond a reasonable doubt any one or more of these elements, then you shall find the defendant not guilty of capital murder, and you shall proceed to consider the lesser included offense of murder of Henry Fulton.
Mack claims that another instruction warned the jury that it must be "uninfluenced by its power to find a lesser offense" when considering the defendant's guilt of the crime of capital murder. The effect of that instruction coerced jurors who believed that Mack was only guilty of a lesser included offense into convicting Mack of the greater charge.
Mack cites State v. Ferreira, 8 Haw. App. 1, 791 P.2d 407 (1990); State v. Thomas, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988); State v. Allen, 301 Or. 35, 717 P.2d 1178 (1986); People v. Taylor, 120 Mich. App. 667, 327 N.W.2d 323 (1982); State v. Korbel, 231 Kan. 657, 647 P.2d 1301 (1982); People v. Kurtzman, 46 Cal.3d 322, 250 Cal. Rptr. 244, 758 P.2d 572 (1988); and People v. McGregor, 635 P.2d 912 (Colo. App. 1981)[4] for the proposition that it is error to require a jury to unanimously agree that the defendant is not guilty of the greater offense before addressing a lesser included offense.
A number of other states require an "acquit first" instruction. Allen, 717 P.2d at 1180 (Citing cases from several states requiring acquit first.). In a case followed by several federal circuits the Second Circuit observed that such an instruction is not *1323 faulty as a matter of law and that it has some benefits for a defendant. United States v. Tsanas, 572 F.2d 340, (2nd Cir.1978). That court decided that the defendant should be given the choice but that if there was a failure to object there is no error in giving acquit first version of the lesser-included-offense instruction. Id. at 345-46.
The fact is, however, that Mack did not object to this instruction at trial. The point is, therefore, waived. Cole v. State, 525 So.2d 365, 370-371, (Miss. 1987); Shelton v. State, 445 So.2d 844, 846 (Miss. 1984).

O.

WHETHER THE EVIDENCE PRESENTED IN AGGRAVATION FAILED TO CHANNEL THE JURY'S DISCRETION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 3 § 28 OF THE MISSISSIPPI CONSTITUTION?

1.
Mack contends that the prosecutor failed to adduce evidence supportive of his claimed aggravators because he failed to formally reintroduce the evidence from the guilt phase.
HAWKINS, Chief Justice, for the Court:

SHOULD THE SENTENCING HEARING BE REVERSED BECAUSE OF THE FAILURE OF THE STATE TO MOVE TO INTRODUCE THE EVIDENCE ADDUCED AND HEARD BY THE JURY IN THE GUILT PHASE OF THE TRIAL?
At the conclusion of the guilt phase of the trial, and prior to going into the sentencing hearing, the State did not make a formal motion to have the jury consider all previous testimony and evidence adduced before the jury during the guilt phase. There was no question in either counsels' or the court's mind but that the State intended for the jury to consider such evidence in the sentencing phase of the trial. The district attorney informed the court, "I would anticipate for the State that we are going to have a very short hearing in our part of this second phase, and we are going to ask the court to receive evidence that's already in court  that's already in evidence and it wouldn't be any question about it, but just certain items... ."
For making a clean and tidy record, it would have been preferable for the State to formally request the court for the jury to consider in the sentencing hearing all evidence heard by the jury in the guilt phase. Hill v. State, 432 So.2d 427, 441 (Miss. 1983). This technical omission could not possibly have affected the jury one way or another, however. The jury obviously knew in its deliberations that it was to consider all evidence introduced during the course of the trial. The sentencing instructions embraced evidence adduced in both phases of the trial.
Mack's reliance on Young v. State, 507 So.2d 48 (Miss. 1987), is misplaced. In Young we held that failure of the State to offer into evidence previous convictions of other crimes at a sentence enhancement hearing following a conviction precluded his being sentenced as an habitual offender under Miss. Code Ann. § 99-19-81. In order for a person to be sentenced under the habitual offender statutes, Miss. Code Ann. §§ 99-19-81 and  83, it is incumbent upon the State to offer evidence of and for the court to consider evidence of other crimes separate and apart from the crime for which he was just convicted.
While there are similarities in the sentencing hearing following a capital murder conviction and a habitual offender sentencing hearing, there are also marked differences. The outcome of the former is always in the hands of a jury, the latter invariably a circuit judge. Miss. Code Ann. § 99-19-101 (Supp. 1993); Nathan v. State, 552 So.2d 99, 106 (Miss. 1989); Hoover v. State, 552 So.2d 834, 836-37 (Miss. 1989); Keyes v. State, 549 So.2d 949, 951 (Miss. 1989); Hurt v. State, 420 *1324 So.2d 560, 561 (Miss. 1982); Adams v. State, 410 So.2d 1332, 1334 (Miss. 1992); Yates v. State, 396 So.2d 629, 631 (Miss. 1981); Wilson v. State, 395 So.2d 957, 959-60 (Miss. 1981).
BANKS, Justice, for the Court:

2.
Mack contends that during his trial the prosecutor's proof and argument went far beyond any statutory aggravating circumstances and had no bearing on Mack's moral culpability.
For example, Mack points to the sentencing instructions, which stated:
You have found the Defendant guilty of the crime of capital murder. You must now decide whether the Defendant will be sentenced to death or life imprisonment for the Capital Murder of Henry Fulton. In reaching your decision, you may objectively consider the detailed circumstances of the offense for which the defendant was convicted, and the character and the record of the Defendant himself.
Mack, however, failed to object to the form of the instruction.
Mack also argues that it was error for the prosecutor to argue, "and a man like this is murdered under the circumstances which you heard during this week, all the circumstances, ... ." He continued, "and the act which he did is capital murder and the penalty for capital murder is death. In this case the penalty for capital murder, after you weigh all the circumstances that you have heard is exactly that and that's death."
Mack fails to cite any authority to support his argument that the prosecutor's comments were improper. It is clear that the prosecutor was merely pointing out the penalties for the act that Mack had already been found guilty of committing. Moreover, it was the jury's duty to weigh all the circumstances, aggravating and mitigating, to determine if Mack should receive a sentence of death or life.
In addition, Mack contends that it was error for the prosecutor to argue that Mack should be sentenced to death because the offense was committed to get money for illegal drugs and that Mack was drinking or using cocaine on the day in question. Mack failed to make any specific objections to the prosecutor's comments. His argument concerning the prosecutor's argument about drugs is, therefore, waived.

3.
Mack claims that the prosecutor repeatedly elicited testimony regarding the personal characteristics of the victim and his family. Mack contends that the prosecutor's argument was highly prejudicial and violative of state law. He cites Willie v. State, 585 So.2d at 679; Wiley v. State, 484 So.2d 339 at 348 (1986).
In Wiley we held that in death penalty cases, as in other cases, the victim's character is ordinarily not at issue and reference thereto is improper. Id. More recently, this Court considered the issue of victim's characteristic evidence in Jenkins v. State, 607 So.2d 1171 (Miss. 1992). In Jenkins, during various parts of the prosecutor's argument, the jury learned that: (1) Dawn Jones was twenty-six years old; (2) Ms. Jones had a seven-year-old son from a previous marriage; (3) Dawn Jones had been married to Leroy Jones for four years; and (4) Ms. Jones was very shy and did not like to wear dresses because they exposed her legs. We observed that this evidence was admissible because the defendant had claimed a relationship with the victim. The evidence in question bore on that issue. This Court also observed that there is no federal constitutional impediment to victim's characteristic evidence. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
In Hansen v. State, 592 So.2d 114, 146, we held that such evidence as is relevant to the crime charged is admissible, notwithstanding an objection that it bears on the victim's character.
During the sentencing phase of the instant case, the prosecutor argued:
And what do we know about Mr. Fulton. Well, we know about him physically don't *1325 we? We know how old he was. He just lacked a few months of being 90 years old. We know that he was only 5'2". We know that he weighed about 100 pounds. We know that. We know about his family, don't we? We know that he had a family. He lived out there for a long time. That he had children and had grandchildren. And they loved him and came to see him quite regularly out of Memphis. We know that his wife died around 1982 and he lived by himself since that time. That he kept a house and he kept it neat. We know about his character. We know that he liked the outdoors. We know that he liked trapping, that he liked to fish. We know that he played dominoes. We know that he associated with friends. We know that he wasn't rich, he didn't own a lot. We know that he lived in the country. We know that he was kind. He was kind to his neighbors. He would give them rides when they needed to go to town. So we know these facts about him. We have a man who was in this house. He probably had been there that day, might have gotten in his truck and might have gone somewhere that day, might have gone to town, might have played dominoes with a friend, came on back to his house where he expected to be safe as anyone should in their own house. He lived by himself. He was an old man. He was a well respected man... .
The prosecutor's use of the victim's characteristic evidence goes well beyond that which we found not improper in Jenkins and Hansen. Some of what the prosecutor alluded to was properly admissible in the guilt phase  Mr. Fulton's size, the fact that Jimmy Mack knew him from playing dominoes with him, the fact that he lived alone. Other facts argued have no relevance at all other than to inflame passions. It is improper argument under this Court's holding in Wiley, and it is to be avoided, the lack of a federal constitutional prohibition, notwithstanding.
The fact is, however, that the error was waived because Mack failed to raise a contemporaneous objection during closing argument on this basis. Mack had moved for a mistrial as a result of questions concerning the Fulton children during the sentencing phase. The court observed that two of the children and a grandchild had testified and that their existence was already a matter of record. The court found no prejudice sufficient for mistrial in the questions during the sentencing phase which did no more than ask if the witness knew the children. Under the circumstances, that ruling was not an abuse of discretion. Later Mack renewed his objection when questions were propounded concerning Fulton's playing dominoes with Jimmy Mack. He did not, however, object when the prosecutor marshalled individually innocuous facts into the argument set forth above. His failure to do so waives the error.

4.
Mack contends that it was error for the prosecutor to argue the heinous, atrocious or cruel circumstances. In the instant case, the jury instructions did not include the aggravating factor "especially heinous, atrocious or cruel." The prosecutor made the following statement during the sentencing phase:
BY MR. MELLEN: ... but simply because you have heard the evidence in this case. You have heard the facts in this case, And you know the heinous  the horrible situation that 
BY MR. WONG:  Objection, Your Honor. May we approach?
BY THE COURT: Heinous and cruel is not an aggravating circumstance. The jury will disregard the statement.
Here, any error that the prosecutor made was cured when Mack objected and the objection was sustained with the judge admonishing the jury to disregard the statement. Lanier v. State, 533 So.2d 473 at 482 (1988), citing to Johnson v. State, 475 So.2d 1136 (Miss. 1985), and Hubbard v. State, 437 So.2d 430 (Miss. 1983).

5.
Mack contends that the giving of the aggravating factor of "avoiding lawful arrest" *1326 without a limiting instruction was error because it failed to adequately guide the jury's discretion. Mack neither objected to the form of the sentencing instruction given, nor submitted a limiting instruction. The point is waived. Hansen, at 152.
SMITH, Justice, for the Court:

6.
Mack next contends that it was error to instruct the jury that it could consider that "the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of the crime of robbery" and that "the capital offense was committed for pecuniary gain" as aggravating circumstances.
In Willie v. State, 585 So.2d 660, 680-681, this Court held:
Not only should the two aggravators not be given as separate and independent aggravators when they essentially comprise one, they may not be given. When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators... . This decision is to be prospective and will take effect from this date forward.
Mack conveniently fails to mention the prospective nature of the decision. Mack was tried and convicted on June 29, 1991, before Willie was decided. This Court has also reaffirmed its holding in Willie in Jenkins v. State, 607 So.2d 1171, 1182-1183 (Miss. 1992). Jenkins was reversed on other grounds, but clearly not for the proposition that Willie applied retroactively rather than prospectively.
This Court recently reaffirmed the prospective nature of its holding in Willie that the giving of the two aggravators together was error in Chase v. State, 645 So.2d 829 (1994). This Court held that "the prohibition of Willie still applies prospectively to those cases tried after that case was decided." There is no merit to this argument raised by Mack. See also Connor v. State, 632 So.2d 1239, 1269 (Miss. 1993).
However, Mack maintains that there was no evidence to warrant the trial court giving the pecuniary gain aggravator to the jury for their consideration. Mack argues that there is a "bright line of demarcation between the robbery and the killing" in that "[s]ince the robbery was completed before Mack killed Fulton, it cannot be said that Mack murdered Fulton for pecuniary gain." However, the record is replete with testimonial evidence that conclusively proves the jury was justified in finding that Mack did indeed kill Fulton for pecuniary gain. Echoing Mack's claim, the dissent claims that Mack "did not kill Fulton to obtain money or anything of monetary value." Yet, in the very next sentence the dissent states:
Rather, Mack robbed Fulton for pecuniary gain. The evidence demonstrates that after striking Fulton with an iron pipe Mack took Fulton's wallet from his person. Then Mack went into Fulton's home and took several items. When Mack loaded all of the items that he wanted from Fulton's home onto the pickup truck, the robbery was complete.
With these arguments in the forefront, the testimony becomes the crucial factor to prove the point that Mack needed money to buy more cocaine and he killed Fulton for that very purpose.
Charles Washington was a long time friend of Mack. On June 19 and 20, 1990, Washington and Mack met in Bolton, Mississippi. Washington testified that he and Mack first went to Jackson, and later ended up at Percy Monroe's house in the early morning hours of June 20th. Later that day, Mack, Washington, and Monroe met a guy named Gregory Hooper out by a lake. Hooper and Mack bought a little white bottle (presumably crack cocaine) for about $25.00. Mack and Hooper left the lake, went and parked the car on the side of the street, and smoked the contents of the bottle. When Mack and Hooper finished smoking the dope, Mack dropped Hooper off and went over to his *1327 "auntie's house", a Mrs. Dawkins, to get some money to buy more drugs. Washington testified that Mack did not have anymore money on him at that time. During this entire episode, Mack was driving the truck.
After speaking to his cousins, and obtaining no money from his aunt, Mack got back into the truck and traveled to Fulton's house. Upon arriving at Fulton's house, Mack blew the horn, Fulton came outside and greeted Mack. Mack got out of the truck and stood at the back "by the cab  between the cab and the back bumper". Fulton was at the back of the truck. Washington and Percy remained in the truck. Mack told Fulton he had a jack to sell him. Mack attempted to get Fulton to look in the back bed of the truck at the supposed jack that was for sale. Washington testified that on each of the three occasions Mack requested Fulton to look in the truck, that Mack put the "iron" on his shoulder. The testimony was as follows:
Q. Did the old man ever look over into the bed of the truck?
A. Yes, sir.
Q. And what happened then?
A. And then the old man looked in the truck and Jimmie drawed the iron back and the old man backed up. And then Jimmie pointed in the truck again and the old man looked in there again and then Jimmie drawed the iron back again and the old man backed up. And the third time when the old man came up to the truck Jimmie hit him behind the head with the piece of iron. I said, "Jimmie, don't kill that old man," but Jimmie had hit the old man.
Fulton fell two steps back, lying on his back. At this point, Washington testified that Mack put the iron in the truck and went in Fulton's house. During the next ten minutes, Mack stole a pistol, radio, tv, and a shotgun from Fulton's house and placed all these items in the truck. Washington testified that when Mack finished this portion of the robbery, he then picked up the iron again to "kill the old man." Percy intervened, but to no avail. In fact, Mack attempted or threatened to strike Percy. Mack struck Fulton three times, placed him in the truck, and transported him down the road where he dumped him in the bushes.
Washington testified that Mack "had some money" when they went to meet some "dude" at the river. When questioned where he got the money, since he had none earlier, Washington, stated:
A. Off the old man.
Q. Did you see that?
A. Yes, sir.
Q. Well, you haven't discussed that before. When was that?
A. When he had knocked the old man out, then he got through killing the old man and he searched him.
Q. Did you see him get any money then?
A. He got his wallet.
Q. Was it any money in the wallet?
A. $40 or $50 was in there.
Q. Did you see that?
A. Yes, sir.
Q. How do you know there was money in the wallet?
A. Because when Jimmie got the money out of the old man's pocket, he came and got in the truck and he put the money in his pocket.
Q. Was this before or after he hit him, the last time?
A. That was when he had killed him, the last time.
Washington later testified that he did not know exactly how much money Mack had earlier when they left Bolton, Mississippi. Washington testified that, "He didn't have no money really because we didn't even have no money to buy nothing to eat with." But after robbing Fulton, Washington testified that Mack had up to $40 or $50.
Monroe testified that Mack needed more money after having smoked the cocaine. *1328 Monroe did not believe that Mack had money on him at that time. His testimony of the events leading up to arrival at Fulton's house parallels that of Washington's. Monroe testified that he heard Mack ask his aunt for $5. However, Monroe's testimony is different from Washington's concerning the events at Fulton's house.
Q. Okay. When you got down there, would you tell the jury what happened?
A. Jimmie Mack drove up in the yard and blowed and Mr. Fulton came out. And they started talking and he told Mr. Fulton that he had something to sell him. And Charles got out and went around to the side of the truck and Mr. Fulton was looking over in the truck and Jimmie Mack stepped back a little bit and drawed back the iron and hit him behind the head and he fell down.
After Mack hit Fulton, Monroe stated:
A. Jimmie Mack went into his pocket and got his wallet out and looked in the other pocket and I don't guess he found anything. Then he went into the house.
According to Monroe, Mack began stealing the items from Fulton's home. When Mack finished stealing, Monroe testified that Mack hit Fulton again. Monroe got out of the truck to stop Mack, but Mack was "fixing to hit me and he said `I ain't going to leave no witnesses.'" Monroe felt Fulton's pulse after Mack hit him two more times. When asked if Monroe knew whether Mack got money from Fulton, Monroe stated "Well, I seen him get some money out of the wallet." Monroe did not know how much Mack got, but he stated "Well, he bought another rock." Monroe was asked about the subsequent events, and testified as follows:
Q. Now, when you got to Mound Bayou, where did you go?
A. Out in the country somewhere with Greg Hooper.
Q. All right. How did you get Gregory Hooper?
A. Jimmie Mack found him somewhere up there at the cafe.
Q. And where did he go?
A. Went out to somebody's house out there in the country.
Q. For what reason?
A. To get another rock.
Q. Rock?
A. Cocaine.
Q. And did you?
A. Yes.
Q. Do you know where?
A. No.
Q. Now, would you describe how you got the rock?
A. Greg Hooper went in the house and got it.
Q. And who did he give it to?
A. Jimmie Mack.
Q. Do you know if he paid for it?
A. Yes.
Q. And where did the money come from?
A. From Jimmie Mack.
Q. And where did the money that Jimmie Mack used come from?
A. Out of his pocket that he got from Mr. Fulton.
On cross-exam, Monroe stated that after Mack hit Fulton the first time, he went into his pockets and got Fulton's wallet. Monroe testified that Washington went into Fulton's house and brought the tv out, that both Mack and Washington loaded Fulton's body into the back of the truck, and Mack got the money out of Fulton's wallet. Monroe testified that this occurred before Mack went into the house.
The testimony of Greg Hooper also illustrates that Mack needed more money to buy additional cocaine. Hooper testified that they all met at the Paradise Lounge in Mound Bayou. After obtaining the crack *1329 cocaine, (for which Mack paid $25.00), Hooper testified that he, Mack, and Monroe smoked the crack. Hooper testified that Mack was short on money the first visit by about $10.00. The dealer would not sell Mack as much as he wanted for the amount he had at the time. Hooper testified that Mack said: "That's okay. I'll go get me some money." After that, Mack, Monroe, and Washington left and said they would be back. When they showed up the second time, all three met Hooper again, and Hooper helped Mack buy cocaine a second time. Hooper said all three acted nervous.
The testimony of Derryl Dawkins, Jacqueline Dawkins, and Dorothy Dawkins confirms that Mack asked for money ($5.00) before "visiting" Henry Fulton. Dorothy Dawkins told Mack that she did not have $5.00, at which point Mack left for Fulton's house. All during these events, Mack, Monroe, Washington, and Hooper were drinking beer, whisky, and smoking crack cocaine.
The testimony and evidence presented make it overwhelmingly clear that Mack murdered and robbed Henry Fulton for pecuniary gain. The jury could have believed Washington's testimony. The jury could have inferred from the evidence and testimony that Mack planned the scheme about the sale of the jack as a diversion of Fulton from the very beginning and that Mack absolutely intended to kill Fulton by striking him in the head with an iron pipe, thus enabling Mack to rob Fulton of property and cash so that Mack could buy more cocaine. Washington testified that Fulton, a 90 year old 5'2", 100 pound man, was still "breathing real hard" after the initial blow to the head by Mack and that after the theft of property from the house that Mack struck Fulton two additional blows to his head, then robbed Fulton of $40.00-$50.00 cash. The jury could have inferred from the evidence that Mack was simply making sure that Fulton was dead prior to taking money off his body. Additionally, there is the reasonable inference from the evidence that the jury could have believed Mack intended "to leave no witnesses." Sufficient evidence existed to support the jury's finding of the pecuniary gain and avoiding arrest aggravating factors. Mack needed more money to buy more cocaine. When he finished stealing property from the house, murdering Fulton, then taking the cash money from Fulton's person, Mack went right back to Hooper to purchase more crack cocaine. The proof amply supports all aggravators determined by the jury. There is absolutely no merit to Mack's contention under this issue.
BANKS, Justice, for the Court:

P.

WHETHER THE FORM OF THE VERDICT INSTRUCTION FAILED TO CLEARLY INSTRUCT THE JURY ON ITS OPTION TO RETURN A LIFE SENTENCE VERDICT IN VIOLATION OF STATE LAW AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION?
Mack contends that the jury instruction S-1-(C), as given by the trial court, was erroneous. He cites Jenkins v. State, 607 So.2d 1171 (Miss. 1992), as support for his argument. Here, as there, the instruction presented the finding for death first. The result is that the space for the foreman's signature comes before the other forms of verdict. This is so because only a death verdict has to be signed by the foreman.
While we termed this instruction erroneous in Jenkins, we reversed on other grounds. Id. at 1180. Here Mack failed to object to the form of the instruction. The point is waived.

Q.

WHETHER THE INSTRUCTIONS AT THE SENTENCING PHASE FAILED TO GUIDE THE JURY'S DISCRETION AS REQUIRED BY ARTICLE 3, § 28 OF THE MISSISSIPPI CONSTITUTION AND THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES?
*1330 Mack argues that the denial of an instruction requiring the jury to presume that life was the appropriate punishment unless "the prosecution convinces you beyond a reasonable doubt, that death is the only appropriate punishment" violated Article 3, §§ 14 and 28 of the Constitution of Mississippi and the Eighth and Fourteenth Amendments to the Constitution of the United States.
In Shell v. State, 554 So.2d 887 (Miss. 1989), the defendant argued that, under the instructions given in his case, death, not life, was presumed to be the proper sentence. Relying on Leatherwood v. State, 435 So.2d 645 (Miss. 1983), this Court found no merit in Shell's contention.
Shell's reliance on Jackson v. Dugger, 837 F.2d 1469, 1473 (11th Cir.1988) is improper. In Jackson, the jury was instructed that death was the appropriate penalty. In the case sub judice, there was no such instruction. Therefore, there was no presumption that death was the proper sentence.
554 So.2d at 904 (emphasis in original).
More recently in Chase, the defendant argued that the accused should go into the sentencing phase with a presumption that life is the appropriate punishment. Rejecting the argument without further comment, this Court restated the exact language it employed in Shell.
Consequently, Mack's claim that the trial court erred in rejecting his instruction that life is presumed to be the appropriate sentence must fail.
Mack argues that the trial court's instruction, permitting the jury to return the death penalty, if it found that the mitigating circumstances did not outweigh the aggravating circumstances, erroneously shifted the burden of proof during the sentencing phase of his trial.
Mack's contention is without merit. The contention raised by Mack has been rejected by this Court on several occasions. Chase, 645 So.2d at 853; Johnson v. State, 475 So.2d 1136, 1142 (Miss. 1985).
Mack also contends that the trial court erred in denying the "pro-sympathy" instruction. Mack proposed and the trial court rejected instruction No. D-2 which provided:
The Court instructs the jury that although at the guilt and innocent phase of the trial, you were instructed that you were not to be swayed by sympathy, at this phase of the trial you are bound by law and your oath as jurors to consider mitigating factors. Mitigating factors are facts that while they do not justify or excuse the crime, nevertheless in fairness, sympathy, and mercy to Jimmie Mack, must be considered by you as extenuating or reducing the degree of his blame or punishment. You may not, however, be swayed by prejudice or public opinion.
In Ladner v. State, 584 So.2d 743 (Miss. 1991), this Court affirmed rejection of an instruction with language verbatim to that of the instruction at issue here. In Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the United States Supreme Court held:
The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror.
Saffle, 494 U.S. at 495, 110 S.Ct. at 1264. See also Pinkney v. State, 538 So.2d 329, 351 (Miss. 1988), vacated on other grounds, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990); Lockett v. State, 517 So.2d 1317, 1338 (Miss. 1987).
Mack also contends that the trial court erred in denying the "mercy" instruction, No. D-9 which provided:
The Court instructs the Jury that there is nothing which would suggest that the decision to afford an individual Defendant mercy and thereby sentence him to life imprisonment *1331 violates the laws of this state or your oath as jurors, and even if you find there are no mitigating circumstances in this case which are worthy of your consideration, nevertheless, you still may sentence the Defendant to life imprisonment.
The defendant has no right to a mercy instruction. Shell v. State, 554 So.2d 887, 905 (Miss. 1989) (Citing Williams v. State, 544 So.2d 782, 788 (Miss. 1987), rev'd on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); Nixon v. State, 533 So.2d 1078 at 1100 (Miss. 1987); Cabello v. State, 471 So.2d 332, 348 (Miss. 1985).
This assignment is without merit.
SMITH, Justice, for the Court:

R.

WHETHER THE AGGREGATE ERROR IN THIS CASE REQUIRES REVERSAL OF THE CONVICTION AND DEATH SENTENCE?
Mack contends that the aggregate effect of the array of errors committed in his trial court requires reversal of the conviction and death sentence. "It is true that in capital cases, although no error, standing alone, requires reversal, the aggregate effect of various errors may create an atmosphere of bias, passion and prejudice that they effectively deny the defendant a fundamentally fair trial." Conner v. State, 632 So.2d 1239 (Miss. 1993).
Based on the conclusions of this Court with regard to the specific issues raised, the errors found do not rise to the level of reversible error individually or in the aggregate.
BANKS, Justice, for the Court:

S.

WHETHER THE DEATH PENALTY IS A DISPROPORTIONATE PUNISHMENT HERE GIVEN THE CIRCUMSTANCES OF THE CRIME AND THE CHARACTER AND HISTORY OF THE DEFENDANT?
Mack argues that his punishment is disproportionate because of his deprived upbringing, i.e., that he was reared amid socio-economic conditions comparable to the third world, that he was a special education student and that his parents were illiterate.
Under Miss. Code Ann. § 99-19-105(3)(c), this Court must review the record in this case and compare it with the other capital murder cases in which this Court has entered judgment since Jackson v. State, 337 So.2d 1242 (Miss. 1976).
Mack argues that the mitigating evidence in this case sets his case apart from other death penalty verdicts. He fails, however, to cite any authority to support his theory that the death penalty is disproportionate merely because mitigating circumstances are present.
Mack was allowed to present evidence of mitigating factors before he was sentenced to death. After hearing the evidence the jury apparently concluded that the mitigating factors did not substantially outweigh the aggravating factors.
Additionally, Mack argues that his sentence also is disproportionate "in light of the trial court's finding that Washington was equally culpable." Washington was allowed to enter a plea to accessory after the fact. This Mack contends is arbitrary and capricious.
Under this Court's holding in Culberson v. State, 379 So.2d 499 (Miss. 1979), cert. denied, 449 U.S. 986, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980), Mack's contention must fall. In Culberson, an accomplice was allowed to plead to manslaughter while Culberson was given the death penalty. This Court held that the imposition of the death penalty was not disproportionate because Culberson's accomplice was allowed to plead to a lesser charge. This Court stated that,
[I]f the state is not permitted to exercise prosecutorial discretion in order to obtain *1332 the testimony of a participant in a capital murder by permitting the one furnishing the testimony to plead guilty to a lesser crime, crimes such as the one in this case would not be solved and all participants would go free. When two or more persons commit a crime and cannot be identified except by one of the participants, the state must be allowed some discretion in securing the testimony of one of the participants in order to solve the crime.
379 So.2d at 510.
The death penalty was not disproportionate as applied in this case.

CONCLUSION
HAWKINS, Chief Justice, for the Court:
For the foregoing reasons the conviction and sentence are affirmed.
CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION AFFIRMED. WEDNESDAY, JANUARY 25, 1995, SET FOR INFLICTION OF THE DEATH PENALTY AS PROVIDED BY LAW.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and PITTMAN, McRAE, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
SULLIVAN and BANKS, JJ., concur as to guilt.
BANKS, J., dissents with separate written opinion as to sentence, joined by SULLIVAN, J.

APPENDIX

DEATH CASES AFFIRMED BY THIS COURT
Chase v. State, 645 So.2d 829 (Miss. Feb. 24, 1994)
Conner v. State, 632 So.2d 1239 (Miss. 1993).
Hansen v. State, 592 So.2d 114 (Miss. 1991).
[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State, 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
Davis v. State, 551 So.2d 165 (Miss. 1989).
Minnick v. State, 551 So.2d 77 (Miss. 1989).
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
Woodward v. State, 533 So.2d 418 (Miss. 1988).
Nixon v. State, 533 So.2d 1078 (Miss. 1987).
Cole v. State, 525 So.2d 365 (Miss. 1987).
Lockett v. State, 517 So.2d 1346 (Miss. 1987).
Lockett v. State, 517 So.2d 1317 (Miss. 1987).
Faraga v. State, 514 So.2d 295 (Miss. 1987).
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Wiley v. State, 484 So.2d 339 (Miss. 1986).
Johnson v. State, 477 So.2d 196 (Miss. 1985).
*1333 Gray v. State, 472 So.2d 409 (Miss. 1985).
Cabello v. State, 471 So.2d 332 (Miss. 1985).
Jordan v. State, 464 So.2d 475 (Miss. 1985).
Wilcher v. State, 455 So.2d 727 (Miss. 1984).
Billiot v. State, 454 So.2d 445 (Miss. 1984).
Stringer v. State, 454 So.2d 468 (Miss. 1984).
Dufour v. State, 453 So.2d 337 (Miss. 1984).
Neal v. State, 451 So.2d 743 (Miss. 1984).
Booker v. State, 449 So.2d 209 (Miss. 1984).
Wilcher v. State, 448 So.2d 927 (Miss. 1984).
Caldwell v. State, 443 So.2d 806 (Miss. 1983).
Irving v. State, 441 So.2d 846 (Miss. 1983).
Tokman v. State, 435 So.2d 664 (Miss. 1983).
Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Hill v. State, 432 So.2d 427 (Miss. 1983).
Pruett v. State, 431 So.2d 1101 (Miss. 1983).
Gilliard v. State, 428 So.2d 576 (Miss. 1983).
Evans v. State, 422 So.2d 737 (Miss. 1982).
King v. State, 421 So.2d 1009 (Miss. 1982).
Wheat v. State, 420 So.2d 229 (Miss. 1982).
Smith v. State, 419 So.2d 563 (Miss. 1982).
Johnson v. State, 416 So.2d 383 (Miss. 1982).
Edwards v. State, 413 So.2d 1007 (Miss. 1982).
Bullock v. State, 391 So.2d 601 (Miss. 1980).
Reddix v. State, 381 So.2d 999 (Miss. 1980).
Jones v. State, 381 So.2d 983 (Miss. 1980).
Culberson v. State, 379 So.2d 499 (Miss. 1979).
Gray v. State, 375 So.2d 994 (Miss. 1979).
Jordan v. State, 365 So.2d 1198 (Miss. 1978).
Voyles v. State, 362 So.2d 1236 (Miss. 1978).
Irving v. State, 361 So.2d 1360 (Miss. 1978).
Washington v. State, 361 So.2d 61 (Miss. 1978).
Bell v. State, 360 So.2d 1206 (Miss. 1978).

DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE
Harrison v. State, 635 So.2d 894 (Miss. 1994).
Butler v. State, 608 So.2d 314 (Miss. 1992).
Jenkins v. State, 607 So.2d 1171 (Miss. 1992).
Abram v. State, 606 So.2d 1015 (Miss. 1992).
Balfour v. State, 598 So.2d 731 (Miss. 1992).
Griffin v. State, 557 So.2d 542 (Miss. 1990).
Bevill v. State, 556 So.2d 699 (Miss. 1990).
West v. State, 553 So.2d 8 (Miss. 1989).
Leatherwood v. State, 548 So.2d 389 (Miss. 1989).
Mease v. State, 539 So.2d 1324 (Miss. 1989).
Houston v. State, 531 So.2d 598 (Miss. 1988).
West v. State, 519 So.2d 418 (Miss. 1988).
Davis v. State, 512 So.2d 1291 (Miss. 1987).
Williamson v. State, 512 So.2d 868 (Miss. 1987).
Foster v. State, 508 So.2d 1111 (Miss. 1987).
Smith v. State, 499 So.2d 750 (Miss. 1986).
West v. State, 485 So.2d 681 (Miss. 1985).
Fisher v. State, 481 So.2d 203 (Miss. 1985).
*1334 Johnson v. State, 476 So.2d 1195 (Miss. 1985).
Fuselier v. State, 468 So.2d 45 (Miss. 1985).
West v. State, 463 So.2d 1048 (Miss. 1985).
Jones v. State, 461 So.2d 686 (Miss. 1984).
Moffett v. State, 456 So.2d 714 (Miss. 1984).
Lanier v. State, 450 So.2d 69 (Miss. 1984).
Laney v. State, 421 So.2d 1216 (Miss. 1982).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT
Reddix v. State, 547 So.2d 792 (Miss. 1989).
Wheeler v. State, 536 So.2d 1341 (Miss. 1988).
White v. State, 532 So.2d 1207 (Miss. 1988).
Bullock v. State, 525 So.2d 764 (Miss. 1987).
Edwards v. State, 441 So.2d 84 (Miss. 1983).
Dycus v. State, 440 So.2d 246 (Miss. 1983).
Coleman v. State, 378 So.2d 640 (Miss. 1979).

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY
[*]Shell v. State, 554 So.2d 887 (Miss. 1989), Shell v. Mississippi, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990) reversing, in part, and remanding, Shell v. State 595 So.2d 1323 (Miss. 1992) remanding for new sentencing hearing.
[*]Pinkney v. State, 538 So.2d 329 (Miss. 1989), Pinkney v. Mississippi, 494 U.S. 1075, 110 S.Ct. 1800, 108 L.Ed.2d 931 (1990) vacating and remanding, Pinkney v. State, 602 So.2d 1177 (Miss. 1992) remanding for new sentencing hearing.
[*]Clemons v. State, 535 So.2d 1354 (Miss. 1988), Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) vacating and remanding, Clemons v. State, 593 So.2d 1004 (Miss. 1992) remanding for new sentencing hearing.
[*]Jones v. State, 517 So.2d 1295 (Miss. 1987), Jones v. Mississippi, 487 U.S. 1230, 108 S.Ct. 2891, 101 L.Ed.2d 925 (1988) vacating and remanding, Jones v. State, 602 So.2d 1170 (Miss. 1992) remanding for new sentencing hearing.
Russell v. State, 607 So.2d 1107 (Miss. 1992).
Holland v. State, 587 So.2d 848 (Miss. 1991).
Willie v. State, 585 So.2d 660 (Miss. 1991).
Ladner v. State, 584 So.2d 743 (Miss. 1991).
Mackbee v. State, 575 So.2d 16 (Miss. 1990).
Berry v. State, 575 So.2d 1 (Miss. 1990).
Turner v. State, 573 So.2d 657 (Miss. 1990).
State v. Tokman, 564 So.2d 1339 (Miss. 1990).
Johnson v. State, 547 So.2d 59 (Miss. 1989).
Williams v. State, 544 So.2d 782 (Miss. 1989).
Lanier v. State, 533 So.2d 473 (Miss. 1988).
Stringer v. State, 500 So.2d 928 (Miss. 1986).
Pinkton v. State, 481 So.2d 306 (Miss. 1985).
Mhoon v. State, 464 So.2d 77 (Miss. 1985).
Cannaday v. State, 455 So.2d 713 (Miss. 1984).
Wiley v. State, 449 So.2d 756 (Miss. 1984).
Williams v. State, 445 So.2d 798 (Miss. 1984).
*1335 BANKS, Justice, dissenting in part:
Because I believe that a number of errors intruded upon the jury's penalty deliberations, I dissent from that portion of today's decision which affirms the sentence.

I.
Mack contends that there was insufficient evidence to support the avoiding arrest aggravator (and by extension, the pecuniary gain and robbery aggravators) because the prosecutor failed to reintroduce the evidence adduced during the guilt phase, other than certain exhibits.
In chambers, before the beginning of the sentencing phase, the prosecutor announced that he intended to use certain exhibits during the sentencing phase which had been used during the guilt phase and that the defendant had voiced an objection to certain of the photographs. The verbatim discussion is as follows:
BY THE COURT: We are on the record in chambers out of the presence of the jury. The jury has returned a verdict finding the defendant guilty of capital murder. We are taking a recess before we start the sentencing phase.
BY MR. MELLEN: Your Honor, I would anticipate for the State that we are going to have a very short hearing in our part of this second phase, and we are going to ask that the Court receive evidence that's already in court  that's already in evidence and it wouldn't be any question about it, but just certain items. I don't see why I would need the larger items such as the tv or something like that. So during this phase of the trial I anticipate asking the Court to receive some of the items, one of which is, of course, a photograph of the decedent. And I advised Mr. Wong, who advised Mr. Pearson, earlier what I anticipated doing and Mr. Wong said he had a question about one thing. So I will leave that up to him.
BY THE COURT: All right. What's the question, counsel?
BY MR. WONG: Your Honor, we would object to the introduction of the picture of Mr. Henry Fulton into the jury's deliberation. We think that would create an arbitrary and capricious decision as to the sentence to be imposed on our client at this time. Also, that would be a violation of the 8th and 14th amendments and the equivalent provisions of the Mississippi constitution and state law.
BY THE COURT: Do you have any authority, counsel?
BY MR. WONG: Yes, sir.
There followed a colloquy concerning the relevance of certain photographs in light of the fact that it was not anticipated that the state would offer "heinous, atrocious and cruel" as an aggravating factor. The court, thereafter, excluded the photographs to which there was an objection. The prosecutor then moved, in the presence of the jury, that certain enumerated exhibits be admitted during the sentencing phase and they were allowed. Thereafter, the prosecutor called a witness to establish that Mack was on parole at the time of the incident and, therefore, was "under sentence of imprisonment." The prosecutor then rested. The defense put on mitigating evidence and, after Mack declined to testify, finally rested. The State offered no rebuttal and finally rested. Mack immediately moved to have the court impose the sentence of life because the State had failed to put on proof necessary to sustain a sentence of death. The question, whether the state could rely upon evidence adduced during the guilt phase without formally offering that evidence, was squarely put to the trial court.
Mack cites Hill v. State, 432 So.2d 427 (Miss. 1983), as an example of the approved procedure. In Hill, we noted that the trial court did not err in granting the state's motion that the evidence adduced at the guilt phase be considered during the sentencing phase. Here no such motion was made. Mack relies on Young v. State, 507 So.2d 48 (Miss. 1987), a case dealing with the bifurcated procedure under our habitual offender *1336 statute. In Young, we reversed the sentence of an habitual offender because the trial court relied upon evidence adduced at the guilt phase but not reintroduced in the sentencing phase.
In response, the state asserts that the trial court correctly relied upon Jackson v. State, 337 So.2d 1242 (Miss. 1976). There, in order to save this state's death penalty statute as constitutional, this Court engrafted a bifurcated scheme upon what was facially a mandatory death penalty statute. Jackson, 337 So.2d at 1251. This Court summarized the sentencing phase as follows:
At the sentencing hearing, the question to be decided by the jury is whether the defendant shall be sentenced to death or to life imprisonment. At this hearing, the State may elect to stand on the case made at the first hearing, if before the same jury, or may reintroduce any part of the evidence adduced at the first hearing which it considers to be relevant to the particular question of whether the defendant shall suffer death or be sentenced to life imprisonment. In addition thereto, an accused's prior record of criminal convictions, if any, may be proven as an additional aggravating circumstance whether the defendant testifies in his own behalf or not. At this hearing, the defendant may prove his lack of a prior criminal record as a mitigating circumstance and may also adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life in prison.
Id. at 1256 (emphasis added).
The first highlighted sentence in the above quote is the language relied upon by the state, and to some extent, by the court below. It is suggested that Jackson approves a procedure wherein the state may rely upon all of the evidence adduced at the guilt phase without making an explicit request to do so. The second highlighted sentence is an indication of the obvious, that is, that the Jackson formulation was not carried forward verbatim into the statute now controlling capital sentencing. One example is that one's prior criminal record is not a statutory aggravator unless the prior offense was capital or violent. Miss. Code Ann. § 99-19-101(5)(b) (Supp. 1993). The statute provides that "evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances." Miss. Code Ann. § 99-19-101(1) (Supp. 1993). "Aggravating circumstances" are limited to those enumerated in the statute. Miss. Code Ann. § 99-19-101(5) (Supp. 1993). The question, then, is not what Jackson means but what does the statute mean with respect to whether the state may rely upon the entire record made during the guilt phase, sub silentio.
The trial court recognized the problem and was obviously uncomfortable with the failure of the prosecutor to make the motion to consider the guilt phase evidence, as had been the custom. The state did not ask to reopen. Nevertheless, the trial court refused Mack's motion based on the view that Mack's approval of the sentencing instruction somehow gave the state cause to forego a motion to consider the guilt phase evidence. The fact is, however, that the instruction was considered prior to trial. It is obvious, therefore, that Mack's approval was as to form only and contingent upon the production of evidence which would make the sentencing instruction appropriate. If that were not the case, the state could have neglected to call the "under sentence" witness and still had that aggravator go to the jury. The trial court's reliance on the prior approval of the sentencing instruction, then, is misplaced.
If we accept the view that the reasons relied upon by the trial court, that is, Jackson and the instruction, are insufficient, we are left with the question whether the procedure utilized is a fair construction of the statute and comports with due process of law and Eighth Amendment death penalty jurisprudence. We must begin the statutory *1337 analysis with the acknowledgement that aggravators are statutorily limited. Evidence not offered in relation to the statutory aggravators, Enmund factors[1], mitigation, or bona fide rebuttal to mitigation, should be excluded.
Subsection (5) of XX-XX-XXX plainly states that the aggravating circumstances "shall be limited" to the eight aggravating circumstances listed. Read in conjunction with subsection (1), the State is limited to introducing evidence relevant to one or more aggravating circumstances.
Coleman v. State, 378 So.2d 640, 648 (Miss. 1979); Balfour v. State, 598 So.2d 731, 747-48 (Miss. 1992). Our statute responds to the command of the Eighth Amendment to the Constitution of the United States that any scheme for imposing the penalty of death must provide a "meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not." Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); quoting Furman v. Georgia, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972).
While we have approved, in some instances, the grant of a motion to consider evidence adduced at the guilt phase, e.g. Hill, there should be no question that a proper objection might result in the exclusion of evidence adduced at that stage but improper for the sentencing phase. An example occurred in the instant case. Mack objected to a portion of that evidence from the guilt phase which was offered by the state. The trial court sustained the objection and the evidence was excluded.
Similarly, it would seem logical to expect that, for example, a court faced with an objection to prior crimes evidence used for impeachment or some other purpose at the guilt phase, but not fitting the category of crime eligible as an aggravator, might be excluded. Moreover, as appears here, there are instances in which evidentiary errors are made during the guilt phase which might be deemed harmless on that issue but take on added gravity in the sentencing phase. Here, evidence to the effect that Mack used cocaine, of dubious value at best, but surely harmless in the guilt phase, may take on added significance to a sentencing jury. Indeed, the prosecutor based a part of his argument on cocaine use. Evidence of flight and firing at the officers has been shown to be problematic here, in light of the fact that Mack had reasons unrelated to this crime to do so.
It follows that a requirement that the state formally offer the evidence that is to be utilized in the sentencing phase, even if by reference, is not a meaningless gesture. It is no more than what is required of an orderly proceeding in which each party is expected to produce that upon which it intends to rely and thereby give the opposing party a meaningful opportunity to object.
We found reversible error in the habitual sentencing context, where the fact-finder was a judge. The judge relied on trial stage evidence without reintroduction. In reversing, we observed that "habitual offender sentencing, like capital sentencing is itself a trial on eligibility for a harsher sentence." Young, 507 So.2d at 50, citing DeBussi v. State, 453 So.2d 1030, 1033 (Miss. 1984). Except for the penalty, this case appears to be on "all fours" with Young.

II.
Mack claims that the prosecutor repeatedly elicited testimony regarding the personal characteristics of the victim and his family. Mack contends that the prosecutor's argument was highly prejudicial and violative of state law. He cites Willie v. State, 585 So.2d 660, 679 (Miss. 1991); Wiley v. State, 484 So.2d 339, 348 (Miss. 1986).
In Wiley, we held that in death penalty cases, as in other cases, the victim's character is ordinarily not at issue and reference *1338 thereto is improper. Id. More recently, this Court considered the issue of victim's characteristic evidence in Jenkins v. State, 607 So.2d 1171 (Miss. 1992). In Jenkins, during various parts of the prosecutor's argument, the jury learned that: (1) Dawn Jones was twenty-six years old; (2) Ms. Jones had a seven year-old son from a previous marriage; (3) Dawn Jones had been married to Leroy Jones for four years; and (4) Ms. Jones was very shy and did not like to wear dresses because they exposed her legs. We observed that this evidence was admissible because the defendant had claimed a relationship with the victim. The evidence in question bore on that issue. This Court also observed that there is no federal constitutional impediment to victim's characteristic evidence. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
In Hansen v. State, 592 So.2d 114, 146 (Miss. 1991), we held that such evidence as is relevant to the crime charged is admissible, notwithstanding an objection that it bears on the victim's character.
During the sentencing phase of the instant case, the prosecutor argued:
And what do we know about Mr. Fulton. Well, we know about him physically don't we? We know how old he was. He just lacked a few months of being 90 years old. We know that he was only 5'2". We know that he weighed about 100 pounds. We know that. We know about his family, don't we? We know that he had a family. He lived out there for a long time. That he had children and had grandchildren. And they loved him and came to see him quite regularly out of Memphis. We know that his wife died around 1982 and he lived by himself since that time. That he kept a house and he kept it neat. We know about his character. We know that he likes the outdoors. We know that he liked trapping, that he liked to fish. We know that he played dominoes. We know that he associated with friends. We know that he wasn't rich, he didn't own a lot. We know that he lived in the country. We know that he was kind. He was kind to his neighbors. He would give them rides when they needed to go to town. So we know these facts about him. We have a man who was in his house. He probably had been there that day, might have gotten in his truck and might have gone somewhere that day, might have gone to town, might have played dominoes with a friend, came on back to his house where he expected to be safe as anyone should in their own house. He lived by himself. He was an old man. He was a well respected man... . .
The prosecutor's use of the victim's characteristic evidence goes well beyond that which we found not improper in Jenkins and Hansen. Some of what the prosecutor alluded to was properly admissible in the guilt phase  Mr. Fulton's size, the fact that Jimmy Mack knew him from playing dominoes with him, the fact that he lived alone. Other facts argued have no relevance at all and inflame passions. Victim characteristic evidence is improper under this Court's holding in Wiley, and, such arguments are to be avoided, the lack of a federal constitutional prohibition, notwithstanding.
Mack had moved for a mistrial as a result of questions concerning the Fulton children during the sentencing phase. The court observed that two of the children and a grandchild had testified and that their existence was already a matter of record. The court found no prejudice sufficient for mistrial in the questions during the sentencing phase which did no more than ask if the witness knew the children. While that ruling standing alone is not erroneous, its support lies in the fact that all evidence in the guilt phase was allowed to be considered in the sentencing phase, regardless of whether it was relevant to sentencing. The combination created a situation where facts adduced during the guilt phase which were extraneous to guilt or sentence, but harmless under the circumstances in the guilt phase, became focal to the argument on the question of sentencing in a manner that we cannot truly deem harmless.

III
Mack next contends that it was error to instruct the jury that it could consider that *1339 "the capital offense was committed while the defendant was engaged, or was an accomplice, in the commission of the crime of robbery" and that "the capital offense was committed for pecuniary gain" as aggravating circumstances.
In Willie v. State, 585 So.2d 660, 680-681, this Court held:
Not only should the two aggravators not be given as separate and independent aggravators when they essentially compromise one, they may not be given. When life is at stake, a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind underlying felony as separate aggravators... . This decision is to be prospective and will take effect from this date forward.
The Willie Rule, however, is to be applied prospectively. In Chase, this Court rejected Chase's contention on the basis that his trial concluded February 28, 1990, before Willie was decided on July 24, 1991.
The prospective application of Willie would bar Mack from relying on Willie since Mack's trial concluded on June 29, 1991.
Though unable to rely upon Willie, Mack's argument is not without merit. In this case, there is a bright line of demarcation between the robbery and the killing. Since the robbery was completed before Mack killed Fulton, it cannot be said that Mack murdered Fulton for pecuniary gain. This writer has not found a case in which this Court has considered the pecuniary gain aggravator in a situation where the offense of robbery was completed and afterward the defendant killed the victim to aid flight or avoid arrest. The aggravator "committed while the defendant was engaged" in any robbery also embraces murders while engaged in "flight after committing" the robbery. Miss Code Ann. 1972 § 99-19-101 (Supp. 1993).
In the instant case, there was no evidence to clearly support pecuniary gain as an aggravating circumstance. That is, Mack did not kill Fulton to obtain money or anything of monetary value. Rather, Mack robbed Fulton for pecuniary gain. The evidence demonstrates that after striking Fulton with an iron pipe Mack took Fulton's wallet from his person. Then Mack went into Fulton's home and took several items. When Mack loaded all of the items that he wanted from Fulton's home onto the pickup truck, the robbery was complete.
After the robbery was completed, Washington and Monroe testified that Fulton was still living. Both of Mack's accomplices testified that Fulton was breathing real hard. Apparently, it was at that point that Mack decided to kill him. Washington and Monroe said Mack said "I ain't gone leave no witnesses behind." He picked up the iron pipe and hit Fulton several more times.
It is clear that Mack killed Fulton either to aid his flight after the robbery or to avoid arrest, rather than for pecuniary gain as argued by the state. Under the circumstances such as those presented here, this Court should hold that it is error to allow an instruction of pecuniary gain as an aggravating circumstance, not only because it is duplicative but because it is not supported by the evidence.
SULLIVAN, J., joins this dissent.
NOTES
[1] By Mr. Mellen: Next, Your Honor, is Marcus Mitchell. This is a male  black male and is unemployed and we object to that fact  object to him because of that fact. We consider that to be showing someone that is  well, being unemployed and being a male, too, would indicate that he might not be stable for the jury, serving on the jury. I don't know what his background is and why he doesn't have a job. But he has no job and this is the only male that I have seen, that I recall looking through the entire jury panel that is unemployed. And I would object to him because of that. There is no gender discrimination claim here. Nor does Mack contend that record phraseology "black male and is unemployed" is a statement of combined reasons rather than a statement of identification plus a statement of reason, as indicated by the explanation which followed.
[2] The record reveals that upon using one of his twelve peremptory challenges to strike Susan A. Palacious, defense counsel corrected the court when the court referred to Palacious as a member of the white race. He stated "Palacious is a Mexican extraction, Your Honor."
[3] Court: Stand up, please, ma'am. Is that Mrs. Love?

Love: Yes.
Pearson: Is it your personal philosophy that if you take a life you should give a life?
Love: It all depends on why he takes the life.
Court: But what the question was, Mrs. Love, would you automatically vote for the death penalty just because there was a life taken? Would you automatically vote for it?
Love: I still don't understand the question.
Court: Will counsel approach the bench, please. I think this is a moot question on this juror.
(BENCH CONFERENCE)
Court: Counsel, she has already told us that she would be affected. She is kin to Cardell Fletcher one of the State's witnesses 
Mellen:  Yes, sir.
Court: I've got her marked as a challenge for cause anyway.
Pearson: She said she couldn't be fair 
Court:  And she said it would affect her. All right.
[4] This case did not really hold that an "acquit first" instruction would be erroneous. It construed the instruction before it to not require that the jury acquit first. Later the Colorado Supreme Court seemed to come down on the side of "acquit first", again, however, in dicta, as it once again construed its pattern instruction as not requiring an acquittal. State v. Padillo, 638 P.2d 15, 18 (Col. 1981).
[*] Case was originally affirmed in this Court but on remand from U.S. Supreme Court, case was remanded by this Court for a new sentencing hearing.
[1] Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), requires findings now codified in our statute at Miss. Code Ann. § 99-19-101(7) (Supp. 1993).